UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OPENEVIDENCE INC., :

       Plaintiff, : Civil Action
   v. : No. 25-11802-RGS

                          :

DOXIMITY, INC., JEY BALACHANDRAN, **ORAL ARGUMENT**
JAKE KONOSKE, PATHWAY MEDICAL, : **REQUESTED**
INC., LOUIS MULLIE, JONATHAN
HERSHON ST-JEAN, HOVHANNES :
KARAPETYAN, ERIC YAMGA, KHUDHUR
MOHAMMED, and VINCE ROY, :

       Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DOXIMITY, INC. AND PATHWAY MEDICAL, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS AMENDED COUNTERCLAIMS

James R. Carroll
William K. Wray Jr.
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116

William E. Ridgway
Brian O'Connor
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
320 S. Canal Street
Chicago, Illinois 60606

Bijal V. Vakil
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301

*Counsel for Counterclaim-Plaintiffs*
*Doximity, Inc. and Pathway Medical, Inc.*

Dated: January 9, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL ALLEGATIONS OF THE COUNTERCLAIMS ......................................................2

ARGUMENT ..................................................................................................................................3

I.      OPENEVIDENCE'S FALSE CLAIMS VIOLATE THE LANHAM ACT.......................3

        A.      OpenEvidence Falsely Claims Its Account Holders Are "Verified"
                Physicians ...............................................................................................................4

        B.      OpenEvidence Makes False Claims About Its Platform's Accuracy ......................4

        C.      OpenEvidence Has Not Scored a "Perfect 100%" on the USMLE .........................7

        D.      OpenEvidence Falsely Claims It Safeguards Confidential Information.................8

        E.      OpenEvidence Disseminates False Claims About Doximity..................................9

                1.      OpenEvidence Promotes Misleading Statistics to
                        Falsely Claim Doximity Is a "Loser in the AI Race"..................................9

                2.      OpenEvidence Falsely Claims It Is Ranked "#1"
                        Over Doximity in a Non-Existent App Category......................................10

                3.      OpenEvidence Makes False Statements About Doximity's Stock ............11

                4.      OpenEvidence Makes False Statements About Doximity's Users ............12

        F.      OpenEvidence Uses Fake Accounts to Deceive Consumers .................................13

        G.      The Counterclaims Plausibly Allege Materiality and Consumer Deception .........13

        H.      The Counterclaims Plausibly Allege Harm............................................................14

II.     OPENEVIDENCE DEFAMED DOXIMITY...................................................................16

        A.      False Claims About Monthly Visits to Doximity and OpenEvidence ..................16

        B.      False Claims About Non-Existent App Store Category.........................................17

        C.      False Claims About Doximity's Stock Performance .............................................17

        D.      False Claims About Doximity's Monthly Active Users........................................18

        E.      OpenEvidence's Falsehoods Are Defamatory Per Se ...........................................18

III.    OPENEVIDENCE'S TACTICS AMOUNT TO UNFAIR COMPETITION ...................19

CONCLUSION.............................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Advance Dx, Inc. v. YourBio Health, Inc.*,
　　753 F. Supp. 3d 53 (D. Mass. 2024) .......................................................13, 14, 15, 17, 19

*Andresen v. Diorio*,
　　349 F.3d 8 (1st Cir. 2003) ...............................................................................................16

*AvePoint, Inc. v. Power Tools, Inc.*,
　　981 F. Supp. 2d 496 (W.D. Va. 2013) .............................................................................13

*Azurity Pharmaceuticals, Inc. v. Edge Pharma, LLC*,
　　45 F.4th 479 (1st Cir. 2022) ...........................................................................3, 8, 9, 10, 14

*Barnia v. Kaur*,
　　646 F. Supp. 3d 154 (D. Mass. 2022) .............................................................................16

*BitSight Technologies, Inc. v. NormShield Inc.*,
　　No. 23-cv-12055-MJJ, 2024 WL 4284373 (D. Mass. Sept. 20, 2024) .............................15

*Boule v. Hutton*,
　　328 F.3d 84 (2d Cir. 2003) ...............................................................................................6

*California Ass'n of Realtors, Inc. v. PDFfiller, Inc.*,
　　No. 16-11021-IT, 2018 WL 1403330 (D. Mass. Mar. 2, 2018) ........................................20

*Carnelli v. Bell at Salem Station*,
　　94 Mass. App. Ct. 1123 (2019) .......................................................................................19

*Casablanca Design Center, Inc. v. Closets by Design, Inc.*,
　　No. 2:23-cv-02155-ODW (PDx), 2024 WL 5689075 (C.D. Cal. Jan. 29, 2024) ...............7

*Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue*,
　　284 F.3d 302 (1st Cir. 2002) ......................................................................................3, 14

*Clemente Properties, Inc. v. Pierluisi Urrutia*,
　　693 F. Supp. 3d 215 (D.P.R. 2023) ...............................................................................16

*Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*,
　　228 F.3d 24 (1st Cir. 2000) ...............................................................................9, 10, 11, 14

*Doe v. Friendfinder Network, Inc.*,
　　540 F. Supp. 2d 288 (D.N.H. 2008) ...............................................................................13

*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
　　797 F.3d 1248 (11th Cir. 2015) ....................................................................................7, 10

*Encompass Insurance Co. of MA v. Giampa*,
    522 F. Supp. 2d 300 (D. Mass. 2007) .............................................................................14

*F.T.C. v. Direct Marketing Concepts, Inc.*,
    624 F.3d 1 (1st Cir. 2010) .................................................................................8, 11, 14

*Galdos-Shapiro v. Town of Great Barrington*,
    No. 24-30070-MGM, 2025 WL 2959878 (D. Mass. Oct. 17, 2025) ...............................18

*Gentle Wind Project v. Garvey*,
    No. 04-103-P-C, 2004 WL 1946448 (D. Me. Sept. 2, 2004).........................................14

*Genzyme Corp. v. Shire Human Genetic Therapies, Inc.*,
    906 F. Supp. 2d 9 (D. Mass. 2012) ...............................................................................14

*Green v. Cosby*,
    138 F. Supp. 3d 114 (D. Mass. 2015).............................................................................16

*Hayes v. Mirick*,
    378 F. Supp. 3d 109 D. Mass. 2019)..............................................................................19

*HipSaver Co. v. J.T. Posey Co.*,
    497 F. Supp. 2d 96 (D. Mass. 2007) ..............................................................................15

*iLab Solutions LLC v. Idea Elan, LLC*,
    14-cv-14267-ADB, 2015 WL 1505698 (D. Mass. Apr. 1, 2015)....................................20

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
    438 Mass. 459 (2003) .....................................................................................................20

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
    127 F.3d 122 (1st Cir. 1997) ...........................................................................................17

*Maddox ex rel. A.G. v. Elsevier, Inc.*,
    732 F.3d 77 (1st Cir. 2013) ...............................................................................................3

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*,
    775 F.3d 109 (1st Cir. 2014) ...........................................................................................20

*McGrath & Co. v. PCM Consulting, Inc.*,
    No. 11-10930-DJC, 2012 WL 503629 (D. Mass. Feb. 15, 2012) ....................................12

*New English Tractor-Trailor Training of Connecticut, Inc. v. Globe Newspaper Co.*,
    395 Mass. 471 (1985) .....................................................................................................18

*Pegasystems Inc. v. Appian Corp.*,
    633 F. Supp. 3d 456 (D. Mass. 2022) .............................................................................15

*Pegasystems, Inc. v. Appian Corp.*,
  No. 19-11461-PBS, 2021 WL 12094221 (D. Mass. Nov. 30, 2021) ...............................13

*Phelan v. May Department Stores Co.*,
  443 Mass. 52 (2004) ...................................................................................................16, 18

*R.I. Seekonk Holdings, LLC v. Hines*,
  425 F. Supp. 3d 37 (D. Mass. 2019) ...............................................................................19

*RainSoft v. MacFarland*,
  350 F. Supp. 3d 49 (D.R.I. 2018) ......................................................................................4

*Ravnikar v. Bogojavlensky*,
  438 Mass. 627 (2003) ......................................................................................................19

*Schotte v. Stop & Shop Supermarket Co.*,
  No. 1:23-cv-10897-IT, 2024 WL 1251284 (D. Mass. Mar. 22, 2024)............................7, 8

*SCVNGR, Inc. v. eCharge Licensing, LLC*,
  No. 13-12418-DJC, 2014 WL 4804738 (D. Mass. Sept. 25, 2014)..................................20

*Seelig v. Infinity Broadcasting Corp.*,
  97 Cal. App. 4th 798 (2002)............................................................................................17

*Semco, Inc. v. Amcast, Inc.*,
  52 F.3d 108 (6th Cir. 1995) ..............................................................................................6

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
  24cv1646 (DLC), 2024 WL 3526853 (S.D.N.Y. July 23, 2024) ....................................5, 6

*Stanton v. Metro Corp.*,
  438 F.3d 119 (1st Cir. 2006)........................................................................................16, 17

*Ultra-Temp Corp. v. Advanced Vacuum Systems, Inc.*,
  27 F. Supp. 2d 86 (D. Mass. 1998) .................................................................................12

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.*,
  647 F.3d 377 (1st Cir. 2011)..............................................................................................3

**REGULATIONS**

16 C.F.R. § 255.0 ...................................................................................................................19

## PRELIMINARY STATEMENT

OpenEvidence is orchestrating a campaign targeting its direct competitors, Doximity and Pathway, with a slew of false and misleading advertisements and unfair competitive tactics. In its bid to deceive consumers, OpenEvidence both misrepresents critical features of its own AI platform and disseminates fabrications about its competitors and their platforms. And OpenEvidence's unfair competition extends further still, using "puppet" social media accounts to hide its involvement in posting negative information about Doximity, lending those posts a false veneer of objectivity and independence.

OpenEvidence's motion ("Pl. Mot.," ECF No. 74) rehashes its own unrelated (and meritless) claims against Doximity and Pathway,[1] mischaracterizes the allegations in the Counterclaims, and seeks to hold Doximity and Pathway to a standard of proof far higher than the applicable pleading requirements at this early stage. The issues OpenEvidence raises present factual disputes that cannot be resolved on a motion to dismiss. OpenEvidence's perfunctory (and often conclusory) legal arguments also cannot withstand scrutiny.

A fair reading of the Counterclaims reveals that Doximity and Pathway set forth, in detail: (i) a host of OpenEvidence advertisements and public statements implicating key features of its own and its direct competitors' products; (ii) explanations of why those advertisements and statements are false, misleading, or defamatory; and (iii) ample bases for concluding that OpenEvidence's unlawful conduct was intended to, and in fact did, cause harm to Doximity and Pathway. OpenEvidence's contention that such well-supported allegations are insufficient even to warrant discovery is unfounded. The Court should deny OpenEvidence's motion in its entirety.

---

[1] In addition to being irrelevant, OpenEvidence's claim that Defendants have somehow admitted to misconduct (Pl. Mot. at 1) is false. Defendants have confirmed that they "registered to use OpenEvidence's AI platform" and entered queries, which in no way suggests a "cyberattack." (*See* Def's Answer, ECF No. 60 ¶¶ 7, 10.)

## FACTUAL ALLEGATIONS OF THE COUNTERCLAIMS

Throughout its motion, OpenEvidence selectively quotes and mischaracterizes the Amended Counterclaims ("Counterclaims," ECF No. 60) to paint allegations as "conclusory." But the Counterclaims demonstrate that OpenEvidence has published all manner of false and misleading claims about its product. For example, the Counterclaims detail that OpenEvidence claims to limit account access to physicians by ensuring they are "NPI-verified" when it actually fails to perform any such identity verification. (*Id.* ¶¶ 24, 29.) OpenEvidence misrepresents the accuracy of its platform by falsely claiming, among other things, that it does not "hallucinate" (*id.* ¶¶ 39–41) and has scored a "Perfect 100%" on the United States Medical Licensing Examination (USMLE) (*id.* ¶¶ 48–52). And it falsely claims that it safeguards confidential patient information when in reality it discloses such information to third parties and the general public. (*Id.* ¶¶ 111–20.)

But OpenEvidence has not stopped at lying about its own product: it has paid to show physicians advertisements on LinkedIn and other platforms that make specific false statements about its direct competitors' businesses and products, including:

- A LinkedIn advertisement proclaiming that "Doximity is a Loser in the AI Race" based on a graph displaying statistics manipulated to falsely convey that the "monthly visits to OpenEvidence" outnumber visits to Doximity GPT twelvefold. In reality, traffic to Doximity is nearly double that of OpenEvidence. (*Id.* ¶¶ 57–63.)

- An advertisement claiming OpenEvidence is ranked "America's #1 App for Doctors" on the Apple App Store, and Doximity is ranked #5, to falsely convey that doctors (a credentialed and trusted group) have chosen OpenEvidence over Doximity. As OpenEvidence knows, there is no such "Doctors" Apple App Store category, and existing Apple App Store metrics do not distinguish downloads or uses by doctors as opposed to all other users. (*Id.* ¶¶ 64–68.)

- Pitch decks impugning Doximity's success and growth among mutual customers with fabricated claims that Doximity has only 300,000 Newsfeed Monthly Active Users (MAUs) and it took Doximity "11 years" to get to 300,000 users. (*Id.* ¶¶ 89–93.)

- A LinkedIn advertisement claiming inaccurately that Doximity's stock prices have underperformed those of McDonald's Corporation for the previous four years, further conveying a false message that Doximity was struggling and inferior. (*Id.* ¶¶ 69–74.)

OpenEvidence's misconduct extends beyond directly publishing false advertisements. It has also deployed a legion of fabricated LinkedIn accounts designed to appear as ***independent*** news sources, with fictitious titles such as "Curated Market Research" and "Tech Law News," to widely promote advertising content maligning Doximity. (*Id.* ¶¶ 75–85.) These puppet accounts conceal the fact that OpenEvidence is the advertiser. (*Id.* ¶ 84.)

## ARGUMENT

On a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts and draws all reasonable inferences in the light most favorable to the Counterclaimants. *United States ex rel. Hwutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). The allegations need only "state a claim to relief that is plausible on its face." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.   OPENEVIDENCE'S FALSE CLAIMS VIOLATE THE LANHAM ACT

To state a false advertising claim under the Lanham Act, Counterclaimants must plausibly allege that: (1) OpenEvidence made a "false or misleading" statement of fact "in a commercial advertisement" about its own or another's product; (2) "the misrepresentation is material"; (3) "the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience"; (4) OpenEvidence placed the misrepresentation "in interstate commerce"; and (5) Counterclaimants have been or are "likely to be injured as a result." *Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 486 (1st Cir. 2022) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir. 2002)). The Counterclaims plausibly allege false advertising across multiple categories of deceptive statements, and none of OpenEvidence's arguments shows otherwise.

### A.    OpenEvidence Falsely Claims Its Account Holders Are "Verified" Physicians

One of OpenEvidence's many falsehoods about its product is its claim that it only allows physicians to create accounts and access its platform while logged in, which deceives consumers about the true size of its physician user base. (Counterclaims ¶¶ 22, 23.) OpenEvidence has made many specific false statements on this topic, including that its logged-in users are "NPI-verified" "true identity physicians," making it "the most widely used medical AI among *verified* U.S. physicians." (*Id.* ¶¶ 24, 29.)[2] In its motion, OpenEvidence misleadingly characterizes these allegations as solely relating to the role of NPIs in account registration and ignores that it has broadly deceived the market into believing OpenEvidence verifies users are physicians.

OpenEvidence contends that the allegations about NPI verification "fail to plausibly allege falsity" because its platform prompts users to enter numerical digits in an "NPI" field and because OpenEvidence purportedly "cross-reference[s] against the user's name." (Pl. Mot. at 12.) That argument misses the point and, at most, raises factual disputes that are inappropriate at the pleading stage—including whether OpenEvidence actually engages in effective "cross-referencing" or such steps conceivably constitute "verification."[3] Doximity has plausibly alleged that OpenEvidence's claims are literally false or, at a minimum, misleading.

### B.    OpenEvidence Makes False Claims About Its Platform's Accuracy

OpenEvidence has also made a slew of inaccurate statements about the accuracy of its medical AI platform. Among the many examples detailed in the Counterclaims, OpenEvidence

---

[2]    OpenEvidence has no support for its argument that "screenshots" of these statements are insufficient at the pleading stage. (Pl. Mot. at 7-8.) And *RainSoft v. MacFarland*, 350 F. Supp. 3d 49 (D.R.I. 2018)—a summary judgment decision where the "only product" promoted was "advice" provided "for free"—is irrelevant to Doximity and Pathway's *pleading* burden in this case between admitted *commercial* competitors. *Id.* at 62.

[3]    Even if the Court could consider these factual issues on this Rule 12(b)(6) motion, OpenEvidence's own allegation that Defendants accessed its platform by entering *NPIs and names that did not correspond* show that no meaningful "cross-reference" ever takes place. (*See, e.g.*, ECF No. 38 ¶ 3.)

falsely claims that: (i) its platform does not "hallucinate"; (ii) its platform does not respond if the literature is inconclusive or it does not know the answer (*id.* ¶¶ 39, 41); and (iii) its model is sufficiently "perfect" that users can rely on it to make "life or death decisions" (*id.* ¶ 40).

OpenEvidence focuses solely on a narrow subset of its statements—namely, those concerning "hallucinations." It declares, without a shred of support, that the word "hallucination" necessarily refers to a platform "fabricating facts" (Pl. Mot. at 12)—a hyper-technical meaning not only divorced from the context of OpenEvidence's advertising, but even inconsistent with dictionary definitions. (Pl. Mot. at 12.)[4] OpenEvidence cannot simply impose its preferred, self-serving definition by fiat, and at most its argument points to a fact dispute.

The Counterclaims include a range of allegations that plausibly suggest the statements about "hallucinations" are literally false, including: (1) research showing the statements ***cannot*** be true (Counterclaims ¶ 37), and (2) user complaints providing concrete examples ***demonstrating*** they are not true (*id.* ¶¶ 43–46). Even adopting OpenEvidence's definition of "hallucination," a user's report that the platform stated "prostate cancer" is pertinent to a "female" patient clearly shows the platform "fabricated" facts; it does not take a doctor to know that is not just "providing an answer a user dislikes." (Pl. Mot. at 12.)[5] OpenEvidence's attempt to diminish such complaints as "anonymous" is of no moment; their existence further confirms it is plausible that OpenEvidence's platform hallucinates and is inaccurate, contrary to its promises. *See, e.g.*, *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 24cv1646 (DLC), 2024 WL 3526853, at

---

[4] *See* https://www.merriam-webster.com/dictionary/hallucination (defining "hallucinations" in the "computing" context as "a plausible but false or misleading response generated by an artificial intelligence algorithm").

[5] OpenEvidence even resorts to arguing the complaining users have "no obvious medical qualifications," directly undermining its claim to verify that its users are physicians. (Pl. Mot. at 12.)

*3 (S.D.N.Y. July 23, 2024) (denying motion to dismiss false advertising claim and rejecting argument that online reviews are insufficient at the pleading stage).

OpenEvidence also incorrectly contends that even if its statements about accuracy are false, it can avoid liability for two of those statements. (Pl. Mot. at 6, 8.)[6]

***First***, OpenEvidence argues it is not liable for a statement that OpenEvidence's platform is "not at risk of hallucinations," which appears in an article in the publication AusDoc. OpenEvidence argues the Court should assess whether the article demonstrates an "intent of influencing potential customers." (Pl. Mot. at 7–8.) But OpenEvidence's intent is a quintessential issue of fact. For example, it is plausible that OpenEvidence provided its claim to AusDoc to promote its services. *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 110, 112–13 (6th Cir. 1995) (article published by a third party containing misrepresentations about the defendant's product was actionable because defendant "had an economic motivation" for providing the statements). OpenEvidence perplexingly relies on the Second Circuit's decision in *Boule v. Hutton*, 328 F.3d 84 (2d Cir. 2003), but that case only further demonstrates that this issue cannot be decided at the pleading stage, as it was an appeal from partial summary judgment and bench trial findings.[7]

***Second***, OpenEvidence argues it is not liable for a statement about hallucinations disseminated through its primary investor Sequoia. (Counterclaims ¶ 41.) But, as OpenEvidence acknowledges, a defendant is liable for a third party's false advertisement if it contributed "by

---

[6] Notably, OpenEvidence does not address its CEO Daniel Nadler's claims that (1) "if OpenEvidence's chatbot doesn't know the answer, it simply says so—avoiding the risk of hallucinations or false confidence," and (2) "these are life and death decisions that our users are making with the platform so it has to be perfect." (Counterclaims ¶¶ 39–40.) These statements alone are sufficient for claims based on OpenEvidence's misrepresentations about accuracy and hallucinations to move forward.

[7] OpenEvidence also appears to argue in a single sentence that because AusDoc is an "Australian publication," a false advertising claim premised on Mr. Ziegler's statement is an "extraterritorial" application of the Lanham Act. (Pl. Mot. at 8.) OpenEvidence wrongfully assumes, however, that the article was not available to or accessed by Americans—yet another fact issue that cannot be resolved on the Rule 12(b)(6) motion.

knowingly inducing or causing the conduct, or by materially participating in it." *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015); *see also Casablanca Design Ctr., Inc. v. Closets by Design, Inc.*, No. 2:23-cv-02155-ODW (PDx), 2024 WL 5689075, at *5 (C.D. Cal. Jan. 29. 2024) (denying motion to dismiss though defendant did not "directly engage[] in false advertising"). Here, it is readily inferable that OpenEvidence was responsible from both its financial relationship with Sequoia (Counterclaims ¶ 41) and endorsement of Sequoia's statements (*id.* ¶ 33). The Counterclaims plausibly allege OpenEvidence "materially furthered the unlawful conduct." *Duty Free*, 797 F.3d at 1277.

### C. OpenEvidence Has Not Scored a "Perfect 100%" on the USMLE

Another way in which OpenEvidence has sought to deceive consumers about the accuracy and trustworthiness of its platform is by claiming it was "the First AI in History to Score a Perfect 100% on the United States Medical Licensing Examination (USMLE)." (Counterclaims ¶ 48.) The Counterclaims plausibly allege this statement is literally false for multiple reasons, including: (1) OpenEvidence ran a publicly available ***sample set*** rather than a real proctored USMLE test, (2) OpenEvidence ***excluded*** image-based questions from that sample set, and (3) even then OpenEvidence answered a question ***incorrectly***. (*Id.* ¶¶ 50–51.) Even putting aside literal falsity, this claim is misleading because it conveys to consumers that OpenEvidence's platform is more accurate than it actually is. (*Id.* ¶ 52.)

OpenEvidence argues that a separate 1,109-page long "answers & explanations" document that, among other things, admits it answered a question incorrectly, is a "disclaimer" that, as a matter of law, sanitizes its headline claim of "Perfect 100%." (Pl. Mot. at 11.) But disclaimers "are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *F.T.C. v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010); *see also Schotte v. Stop &*

7

*Shop Supermarket Co.*, No. 1:23-cv-10897-IT, 2024 WL 1251284, at *4 (D. Mass. Mar. 22, 2024). Here, OpenEvidence's admission was not "prominent"; it was buried in document over a thousand pages long and published separately from the advertisements. (Counterclaims ¶¶ 48–51.) At best, this argument raises factual disputes.

**D.**      **OpenEvidence Falsely Claims It Safeguards Confidential Information**

Next, OpenEvidence has falsely claimed it safeguards confidential patient information when in actuality it discloses patient data to third parties and the public. (Counterclaims ¶¶ 111–20.) OpenEvidence mischaracterizes the Counterclaims based on these misrepresentations as limited solely to assertions about HIPAA compliance and argues such statements are not actionable. (Pls. Mot. at 9–10.) OpenEvidence simply ignores its other false advertising, including its ***factual*** assertion that it has "administrative, physical, and technical safeguards" that "ensure the confidentiality, integrity, and availability of electronic PHI." (Counterclaims ¶ 114.)[8] Separate from any legal opinion, that false statement alone is a basis for a claim. Moreover, contrary to OpenEvidence's argument, its claims about HIPAA compliance are actionable too; the Counterclaims explain how OpenEvidence violated specific obligations in the HIPAA Privacy Rule, which requires safeguards that protect the privacy of protected health information and sets limits and conditions on uses and disclosures made without an individual's authorization. (Counterclaims ¶ 115.) Those obligations are clear, and OpenEvidence's practice of selling confidential patient data to advertisers violates them. *Azurity* is inapposite, including because there the compliance theory relied on non-binding "recommendations." 45 F.4th at 492.

---

[8]      OpenEvidence likewise ignores the allegations establishing the falsity of this messaging: OpenEvidence publicly discloses confidential information including "full patient name, medical record number (MRN), date of birth, medical condition, and treatment"—even a clinical assessment noting cataloguing a patient's "arousals." (*Id.* ¶¶ 117–18.) And it has openly boasted that it sells physician-specific prompt data. (*Id.* ¶¶ 121–23.)

### E. OpenEvidence Disseminates False Claims About Doximity

OpenEvidence's barrage of promoted online posts that directly target Doximity and make false comparisons between Doximity and OpenEvidence are likewise false and misleading. Here too, OpenEvidence's arguments that the Counterclaims fail to plausibly plead claims based on these misrepresentations fail.

#### 1. OpenEvidence Promotes Misleading Statistics to Falsely Claim Doximity Is a "Loser in the AI Race"

First, OpenEvidence has published an advertisement proclaiming that "Doximity is a Loser in the AI Race," based on a line graph purporting to show that the "monthly visits to OpenEvidence" outnumber visits to Doximity GPT twelvefold. (Counterclaims ¶¶ 57–63.) That comparison is deliberately and demonstrably deceptive: the graph "only includes traffic to the 'Doximity AI' domain," not Doximity's app, and a "comparison of traffic to doximity.com and openevidence.com from the same source (SimilarWeb) and timeframe, shows that traffic to Doximity is nearly double that of OpenEvidence." (Counterclaims ¶¶ 60–61.) On top of that, the advertisement claims the graph depicts the "exponential growth of OpenEvidence *among doctors*," while the chart depicts visits from the *general user population*. (*Id.* ¶¶ 58–59.)

OpenEvidence argues that one sentence—"Doximity is a loser in the AI race"—is inactionable puffery. But OpenEvidence ignores the full context of the advertisement. A claim of "product superiority" is not puffery when its context makes it "specific and measurable." *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 39 (1st Cir. 2000) ("[s]tanding alone" a statement comparing detergents "might well constitute an unspecified boast"; in context, it "invite[d] consumers to compare" the "whitening power" of the various detergents); *Azurity*, 45 F.4th at 503 ("Better Ingredients, Better Pizza" slogan is not mere puffery when advertisements "compared specific ingredients" and "the slogan was given quantifiable, and fact-specific

meaning" (citations omitted)). That is the case here. The statement that Doximity is a "loser" in a "race" with OpenEvidence is accompanied by purported data and imagery that inform consumers that the statement has a specific, factual message about user visits.

Even disregarding the "loser in the AI race" sentence, OpenEvidence does not contest that the graph and other factual claims in the advertisement are deceptive. With and without that sentence, the advertisement "invites consumers to compare" OpenEvidence to Doximity and conclude that OpenEvidence is superior based on web traffic. *Clorox*, 228 F.3d at 39. That states a claim. At most, OpenEvidence raises disputes about reasonable consumer interpretation that the Court cannot resolve in OpenEvidence's favor at this stage.

Finally, OpenEvidence attempts to disclaim responsibility for its own advertisement because some of its content may have originated with its investor Coatue. (Pl. Mot. at 7.) But even if the advertisement incorporates third-party statements, OpenEvidence "actively and materially furthered the unlawful conduct" when it created an advertisement that endorsed Coatue's claims and made new claims of its own. *Duty Free*, 797 F.3d at 1277. For example, OpenEvidence itself claims Coatue's data shows the "growth of OpenEvidence among doctors." (Counterclaims ¶¶ 57–58.) It cannot pin responsibility for its own advertisement on Coatue.

### 2. OpenEvidence Falsely Claims It Is Ranked "#1" Over Doximity in a Non-Existent App Category

OpenEvidence also falsely claims it is "America's #1 App for Doctors" above Doximity on the Apple App Store, even though ***there is no such App Store category***. (Counterclaims ¶¶ 64–66.) OpenEvidence again argues "puffery," contending that the advertisement is mere "rhetorical hyperbole" and "unspecified boasting." (Pl. Mot. at 9.) But the "#1" claim does not appear in isolation; it is juxtaposed with the statement that Doximity is "#5 for Doctors," falsely conveying there is a metric by which Doximity is measurably inferior to OpenEvidence. Far

from "unspecified boasting," this specific claim "invites consumers to compare" OpenEvidence to Doximity and is actionable. *Clorox*, 228 F.3d at 39.

As with the USMLE claim, OpenEvidence again attempts to rely on a purported "disclaimer" as a cure for falsity. Notably, this argument is incompatible with OpenEvidence's "puffery" argument, as OpenEvidence concedes the "#1" claim is ***factual*** by contending that the disclaimer informs the message. In addition, "[a]nything less" than an unambiguous disclaimer "is only likely to cause confusion." *F.T.C.*, 624 F.3d at 12. And this "disclaimer" does not unambiguously address the deceptive aspects of the advertisement—for example, it says nothing about the non-existent "Doctors" category. Whether the disclaimer fixes falsity for consumers is, at best, a fact question OpenEvidence cannot short-circuit with its own say-so.

### 3. OpenEvidence Makes False Statements About Doximity's Stock

OpenEvidence has also claimed in public advertisements that Doximity's stock has "underperform[ed] McDonald's over the last four years." (Counterclaims ¶¶ 69–74.) OpenEvidence again cries puffery, asserting without explanation that this is a "tongue-in-cheek, rhetorical comparison that no reasonable consumer would interpret as a precise factual claim." (Pl. Mot. at 9.) But the statement created a false impression that Doximity was struggling, when at the time it was growing and trading at a high revenue multiple. (Counterclaims ¶ 73.)

OpenEvidence also introduces evidence from outside the pleadings to argue its statement is somehow true. But it relies on purported stock prices from a ***3 year and 11-month*** period—not the "***four-year period***" referenced in the advertisement. (Pl. Mot. at 10.) It does not contest, nor could it, that extending back that additional month makes all the difference, because "Doximity's stock trades at a premium of roughly six times its private May 2021 price, and over 150 percent higher than its June 2021 IPO price—well above McDonald's roughly 25 percent gain over the same four-year period." (Counterclaims ¶ 72.) It argues in a footnote that the May 2021 price is a

"red herring" because it is not a "public price." (Pl. Mot. at 10 n.8.) But OpenEvidence does not even try to claim the June 2021 IPO price is not "public." At bottom, its claim that McDonalds did better over a ***four-year period*** is literally false, and OpenEvidence tacitly admits as much.

### 4. OpenEvidence Makes False Statements About Doximity's Users

Finally, OpenEvidence has asserted that (1) Doximity has 300,000 Newsfeed Monthly Active Users (MAUs)—a false claim with no basis in the sources OpenEvidence cites, and (2) it took Doximity "11 years" to get to 300,000 users, which is false because the product OpenEvidence appears to reference did not launch until May 2020. (Counterclaims ¶¶ 89–93.)

Puzzlingly, OpenEvidence argues that its "11 years" claim "cannot be 'literally false'" because of a statement in Doximity's S-1. (Pl. Mot. at 10.) But the S-1 said nothing about any product taking "11 years" to get to 300,000 users. OpenEvidence took a statement about ***present day users*** and made up the "11 years" part with no basis at all. The claim is false, and OpenEvidence's "reliance" on its "interpretation" of the S-1 cannot shield it from that reality.

OpenEvidence also argues that these statements are immune from suit because they are in pitch decks rather than traditional mass market advertisements. (Pl. Mot. at 7–8.) But the Lanham Act does not only apply to "traditional media channels." *McGrath & Co. v. PCM Consulting, Inc.*, No. 11-10930-DJC, 2012 WL 503629, at *5 (D. Mass. Feb. 15, 2012).[9] OpenEvidence created pitch decks intended for customers that contain false statements about Doximity. It argues it only showed them to a "limited number" of customers (Pls. Mot. at 8), but that raises another fact dispute outside the pleadings. Especially considering that OpenEvidence

---

[9]    OpenEvidence cites *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 27 F. Supp. 2d 86 (D. Mass. 1998). That case held, at ***summary judgment***, that commercial advertising required "something more in the realm of public dissemination than . . . a single, discrete misrepresentation to one potential customer." *Id.* at 95. It provides no basis for dismissal at the pleading stage where the number and nature of the target audience of the false statements is as of yet unknown to Doximity (but will be the subject of discovery).

is actively targeting Doximity across numerous channels (Counterclaims ¶¶ 94–102), it is plausible that it disseminated the decks in a way that constitutes commercial advertising.

### F. OpenEvidence Uses Fake Accounts to Deceive Consumers

OpenEvidence has independently violated the Lanham Act by controlling fake LinkedIn accounts under false names to promote posts disparaging Doximity. (Counterclaims ¶¶ 75–85.) In a footnote, OpenEvidence claims that lying about the author of a post is outside the Lanham Act's scope. (Pl. Mot. at 6 n.5.) But as many courts have recognized, the Lanham Act prohibits deceiving consumers about affiliation with a product. *See Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 306 (D.N.H. 2008) (using a false profile for marketing purposes gives rise to false advertising claim); *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 514 (W.D. Va. 2013) (denying motion to dismiss where defendant created fictitious LinkedIn profile to sow confusion regarding plaintiff's products). The same principle applies here. OpenEvidence hides its control of the accounts to trick consumers into believing that credible ***independent*** sources are disparaging its competitor. (*Id.*) That is false advertising.

### G. The Counterclaims Plausibly Allege Materiality and Consumer Deception

OpenEvidence makes a brief, unsupported argument that none of its falsehoods is material—that is, likely to influence consumers' purchasing decisions. (Pl. Mot. at 13.) But "materiality is generally a question of fact." *Pegasystems, Inc. v. Appian Corp.*, No. 19-11461-PBS, 2021 WL 12094221, at *6 (D. Mass. Nov. 30, 2021) (citation omitted). And the Counterclaims plausibly allege that OpenEvidence's advertisements are likely to influence consumers. OpenEvidence's statements are directed toward its own supposed superiority, the purported inferiority of its direct competitors, and core elements of the competing medical AI platforms such as their accuracy. *See, e.g.*, *id.* at *6 (statements "communicat[ing] that [the defendant's] product is inferior" are material); *Advance Dx, Inc. v. YourBio Health, Inc.*, 753 F.

Supp. 3d 53, 67 (D. Mass. 2024) (denying motion to dismiss and holding it was plausible that statements about product superiority were "likely to influence the purchasing decisions of . . . current and prospective customers"); *Cashmere*, 284 F.3d at 311–12 (false statements about an "inherent quality or characteristic" of a product are material).

Relatedly, OpenEvidence suggests that the Counterclaims fail to allege "actual deception" because they do not identify specific individuals who were "actually misled." (Pl. Mot. at 13.) Even if such a showing was required for liability (and it is not), on "a motion to dismiss, a court must credit . . . allegations of misleading advertising" and a plaintiff is not required to "identify the particular [evidence]" it will use to show deception. *Clorox*, 228 F.3d at 37 n.11.[10] Moreover, where, as here, statements are "alleged to be literally false," a Lanham Act violation "may be established without evidence of consumer deception" at all. *Azurity*, 45 F.4th at 487 (quoting *Cashmere*, 284 F.3d at 311); *see also Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*, 906 F. Supp. 2d 12, 17–18 (D. Mass. 2012) (Stearns, J.) (denying motion to dismiss and applying "presumption of consumer deception" to alleged "dissemination of literally false statements"). Similarly, even for claims that are misleading rather than literally false, no actual deception is required where, as here (*see* Counterclaims ¶¶ 59, 93, 143, 144), the false advertiser "intentionally deceived the consuming public." *Cashmere*, 284 F.3d at 311 n.8.

### H.     The Counterclaims Plausibly Allege Harm

OpenEvidence next argues that Doximity and Pathway failed to plausibly allege that any of OpenEvidence's falsehoods harmed them. That fails as well. Doximity and Pathway need only

---

[10]     None of OpenEvidence's inapposite cases hold that allegations about specific deceived consumers are required. (*See* Pl. Mot. at 13 (citing *Encompass Ins. Co. of MA v. Giampa*, 522 F. Supp. 2d 300, 311 (D. Mass. 2007) (parties not alleged to be competitors and claim based solely on conclusory allegation that defendant "made false and misleading representations of fact in commercial advertising"); *Gentle Wind Project v. Garvey*, No. 04-103-P-C, 2004 WL 1946448, at *5 (D. Me. Sept. 2, 2004) ("hypnotherapist" not alleged to have "promoted" any "product" at all); *F.T.C.*, 624 F.3d at 7 (affirming grant of summary judgment ***finding liability*** on false advertising claim).)

plausibly allege that OpenEvidence's "deception . . . caused or [was] likely to cause damage" or "affected [its] reputation in the community." *Advance Dx*, 753 F. Supp. 3d at 68; *see also BitSight Techs., Inc. v. NormShield Inc.*, No. 23-cv-12055-MJJ, 2024 WL 4284373, at *12 (D. Mass. Sept. 20, 2024) ("[a] precise showing" of harm "is not required" at the pleading stage). And there is a "presumption of injury and causation" where, as here, the defendant "made a false comparative advertising claim." *Pegasystems Inc. v. Appian Corp.*, 633 F. Supp. 3d 456, 470 (D. Mass. 2022); *see also HipSaver Co. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 109 (D. Mass. 2007) (presumption for "comparative statements targeting a direct competitor's products").

Drawing all reasonable inferences in their favor and applying the standards above, there is ample basis in the Counterclaims to infer that OpenEvidence's conduct harmed or is likely to harm Doximity and Pathway.[11] As OpenEvidence alleges in its own complaint, the parties are direct competitors targeting the same consumers in a "hyper-competitive" industry (ECF No. 38 ¶¶ 5, 14, 22, 41). Against that backdrop, OpenEvidence is harming Doximity and Pathway by, among other things, targeting their "reputation among physicians" at large, and interfering with individual "client relationships." (*See, e.g.*, Counterclaims ¶¶ 85, 104, 105.) The challenged statements include direct comparisons between the parties, and concern core features of their platforms including accuracy and trustworthiness. (*Id.* ¶¶ 22, 40, 41, 52, 56.) Many of them explicitly target Doximity by name. OpenEvidence cannot credibly suggest its advertisements were not intended to injure Counterclaimants' business for its own benefit.

OpenEvidence tellingly fails to cite any cases holding that a ***direct competitor's*** false advertising—let alone clearly referring to the competing party—did not plausibly allege harm. In

---

[11]    OpenEvidence argues that its advertisements did not specifically name Pathway. (Pl. Mot. at 13.) But as explained above, the Counterclaims plausibly suggests that OpenEvidence, a direct competitor of Pathway, caused it competitive harm by misrepresenting numerous aspects of its own platform.

*Clemente Properties, Inc. v. Pierluisi Urrutia*, 693 F. Supp. 3d 215 (D.P.R. 2023), the plaintiffs did not even "suggest[]" that defendants' use of a trademark "caused 'consumers' to withhold trade from them." *Id.* at 245. This case is far different.

## II.   OPENEVIDENCE DEFAMED DOXIMITY

Many of OpenEvidence's false statements about Doximity are also defamatory. *See Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1st Cir. 2006) (Massachusetts recognizes claims for defamation based on the "publication of a false statement of and concerning the plaintiff which was capable of damaging [its] reputation"). At the threshold, OpenEvidence incorrectly asserts that Doximity's defamation claim is subject to a "heightened" pleading standard. (Pl. Mot. at 4.) But in federal court, notice pleading standards govern. *Andresen v. Diorio*, 349 F.3d 8, 17 (1st Cir. 2003) ("[S]tate pleading requirements . . . are irrelevant in federal court even as to claims arising under state law."); *see also Barnia v. Kaur*, 646 F. Supp. 3d 154, 170 (D. Mass. 2022) (declining to "apply Massachusetts' heightened pleading standard for defamation").

### A.   False Claims About Monthly Visits to Doximity and OpenEvidence

OpenEvidence's advertisement claiming that Doximity is a "Loser in the AI Race" based on a false apples-to-oranges comparison of monthly visits is textbook defamation. OpenEvidence suggests it is mere "rhetorical hyperbole" (Pl. Mot. at 15), rehashing its meritless puffery argument dispatched above. (*See* Section I.E.1, *supra*).[12] In addition, "'[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists.'" *Stanton*, 438 F.3d at 125 (quoting *Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 56–57 (2004)). Here, the advertisement is clearly "susceptible" to a defamatory meaning; it

---

[12]   OpenEvidence also again argues its advertisement incorporates content originally authored by its investor Coatue. But as with the Lanham Act, sole authorship is not required to state a defamation claim. *See Green v. Cosby*, 138 F. Supp. 3d 114, 138 (D. Mass. 2015).

contains discernible, false factual statements attacking Doximity. And the phrase "loser in the AI race" is defamatory because it is informed by specific claims—a point OpenEvidence's cases acknowledge. *See, e.g.*, *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 130 (1st Cir. 1997) (evaluating whether descriptor could be "pinned down by context"); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 810 (2002) (examining statements "in context" to determine whether they "state actual facts about plaintiff").

### B. False Claims About Non-Existent App Store Category

OpenEvidence's claim that it is ranked above Doximity and Pathway in a made-up App Store category for "Doctors" is defamatory as well. OpenEvidence argues that "there is nothing inherently reputation-damaging about being ranked #5 in a competitive market." (Pl. Mot. at 15–16.) But that is not all the advertisement said. Rather, as detailed above, it falsely conveys that physicians, a key consumer group, prefer OpenEvidence's product. This is much like the statements found defamatory in *Advance Dx*, where the court held that a competitor's claim that its product "was more accurate, superior, and ha[d] stronger consumer preference" than the plaintiff's product was defamatory because it was "'capable of damaging [the plaintiff's] reputation in the community.'" 753 F. Supp. 3d at 61–62 (citation omitted). OpenEvidence's claim similarly "falsely diminish[es] the perceived quality of Doximity's products and success in the marketplace among . . . current and potential customers." (Counterclaims ¶ 156.)

### C. False Claims About Doximity's Stock Performance

OpenEvidence has also defamed Doximity by falsely claiming that Doximity's stock has "underperform[ed] McDonald's over the last four years." (*Id.* ¶¶ 69–74.) OpenEvidence argues it can escape liability because the advertisement did not directly name Doximity. That is wrong. In Massachusetts, "a statement need not explicitly refer to the plaintiff to constitute defamation." *Stanton*, 438 F.3d at 128. It must only be "of and concerning" the defamed party, which is true if

the defendant either (1) "intended its words to refer to the [party]," or (2) negligently published words that could "reasonably could be interpreted to refer to the [party]." *New Eng. Tractor-Trailor Training of Conn. v. Globe Newspaper Co.*, 395 Mass. 471, 483 (1985). Here, OpenEvidence's advertisement states "[w]hen your CEO drops 'AI' 24 times in a single earnings call" (Counterclaims ¶ 69), and OpenEvidence promoted it "shortly after [a] Doximity earnings call" in which the phrase "AI" was used 24 times (*id.* ¶ 70). OpenEvidence does not dispute—because it cannot—that it "intended" to refer to Doximity and its words "reasonably could be interpreted to refer to" Doximity. That states a claim. *Globe Newspaper*, 395 Mass. at 483.[13]

### D.     False Claims About Doximity's Monthly Active Users

Last, OpenEvidence's specific and verifiably false statements about Doximity's Monthly Active Users defame Doximity by falsely impugning the pace of its growth and claiming OpenEvidence's performance is superior. (*See* Counterclaims ¶¶ 89-93.) OpenEvidence argues that Doximity does not list the customers OpenEvidence provided these statements to. But before discovery, only OpenEvidence knows the full extent of dissemination. Moreover, "[t]he element of publication is satisfied where the defamatory communication is transmitted to even one person." *Phelan*, 443 Mass. at 56. It is reasonable to infer that OpenEvidence showed the decks to at least one customer, and OpenEvidence concedes as much. (*See* Pl. Mot. at 8.)

### E.     OpenEvidence's Falsehoods Are Defamatory Per Se

Finally, OpenEvidence again argues Doximity has not sufficiently alleged harm, citing yet more cases where, unlike here, the complaint did "nothing more than recite the elements of a defamation claim." *Hayes v. Mirick*, 378 F. Supp. 3d 109, 116 (D. Mass. 2019). For the reasons

---

[13] In *Galdos-Shapiro v. Town of Great Barrington*, No. 24-30070-MGM, 2025 WL 2959878 (D. Mass. Oct. 17, 2025), the court held that the statement was not defamatory not for failure to name the plaintiff, but because it was "more fairly read" as saying something positive rather than negative about the plaintiff. *Id.* at *19.

detailed in Section I.G, *supra*, that is incorrect. But OpenEvidence's argument fails for an additional reason with respect to defamation: Its statements are plainly alleged to "damage a business reputation" and thus constitute defamation per se, which is actionable without proof of economic loss. *R.I. Seekonk Holdings, LLC v. Hines*, 425 F. Supp. 3d 37, 47 (D. Mass. 2019); *see Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003). OpenEvidence's statements are akin to those at issue in *Advance Dx*, where the court refused to dismiss a defamation claim based on statements "indicating [plaintiff's product's] inferiority and lower accuracy." 753 F. Supp. 3d at 65 (also noting that the statements prejudiced the plaintiff's business reputation and deprived it "of a market of consumers it would otherwise have enjoyed"). OpenEvidence cites *Carnelli v. Bell at Salem Station*, 94 Mass. App. Ct. 1123 (2019), but that decision analyzed the requirements for a distinct category of statements that prejudice an individual's "profession," not attacks on a business's reputation. *Id.*

## III. OPENEVIDENCE'S TACTICS AMOUNT TO UNFAIR COMPETITION

Doximity and Pathway also state unfair competition claims under Massachusetts General Laws Chapter 93A. OpenEvidence has made a range of false and misleading statements about its product and its competitors. (*See* Section I, *supra*.) OpenEvidence agrees that if those statements violate the Lanham Act, they violate Chapter 93A as well. *See Advance Dx*, 753 F. Supp. 3d at 73 ("'[A] plausible Lanham Act claim also states a [c]hapter 93A claim.'" (citation omitted)).

OpenEvidence also independently violates Chapter 93A by using puppet accounts to deceive consumers into believing its disparagement came from independent third parties. OpenEvidence does not contest that this conduct violates the FTC's Guides Concerning Use of Endorsements and Testimonials in Advertising, codified at 16 C.F.R. § 255.0. "Because Massachusetts has folded the FTC Act into Chapter 93A, unfair or deceptive conduct that violates the FTC Act also violates Chapter 93A." *McDermott v. Marcus, Errico, Emmer &*

*Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014). The Counterclaims plausibly allege that OpenEvidence's deception about who is disparaging Doximity is likely to mislead consumers and therefore violates Chapter 93A.

OpenEvidence argues that the Chapter 93A claims should be dismissed because its misconduct did not primarily and substantially occur in Massachusetts. But the Chapter 93A locality inquiry is "fact intensive and unique to each case," and the Massachusetts Supreme Judicial Court has stated that courts should not resolve it until "after making findings of fact." *Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*, 438 Mass. 459, 473 (2003). Thus, most courts deny motions to dismiss on this basis to permit the parties to develop a factual record. *See, e.g., iLab Sols. LLC* v. *Idea Elan, LLC*, No. 14-cv-14267-ADB, 2015 WL 1505698, at *2–3 (D. Mass. Apr. 1, 2015); *SCVNGR, Inc.* v. *eCharge Licensing, LLC*, No. 13-12418-DJC, 2014 WL 4804738, at *6–7 (D. Mass. Sept. 25, 2014). This Court should do the same. Even if the Court were to address the issue on the pleadings, the Counterclaims allege OpenEvidence engaged in misconduct while "[doing] business, conduct[ing] its principal operations, and maintain[ing] its headquarters" in Massachusetts. (Counterclaims ¶ 151.) That is enough. *Cal. Ass'n of Realtors, Inc. v. PDFfiller, Inc.*, No. 16-11021-IT, 2018 WL 1403330, at *21 (D. Mass. Mar. 2, 2018) (holding that "significant portion of the misconduct took place in Massachusetts" were sufficient to state a claim).

## CONCLUSION

For all the reasons set forth above, the Court should deny OpenEvidence's motion to dismiss Doximity and Pathway's Amended Counterclaims in its entirety.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Counterclaim-Plaintiffs Doximity, Inc. and Pathway Medical, Inc. respectfully request oral argument on this motion.

Dated: January 9, 2026
Boston, Massachusetts

Respectfully submitted,

/s/ *James R. Carroll*
James R. Carroll (BBO #554426)
William K. Wray Jr. (BBO #689037)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
william.wray@skadden.com

William E. Ridgway (*pro hac vice*)
Brian O'Connor (*pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
320 S. Canal Street
Chicago, Illinois 60606
(312) 407-0700
william.ridgway@skadden.com
brian.oconnor@skadden.com

Bijal V. Vakil (*pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
(650) 470-4500
bijal.vakil@skadden.com

*Counsel for Counterclaim-Plaintiffs*
*Doximity, Inc. and Pathway Medical, Inc.*