# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OPENEVIDENCE INC.,                                          :

                        Plaintiff,                          :          Civil Action
                                                                       No. 25-11802-RGS
            v.                                               :
                                                                       **JURY TRIAL DEMANDED**
DOXIMITY, INC., JEY BALACHANDRAN,                           :
JAKE KONOSKE, PATHWAY MEDICAL,
INC., LOUIS MULLIE, JONATHAN                                :
HERSHON ST-JEAN, HOVHANNES
KARAPETYAN, ERIC YAMGA, KHUDHUR                             :
MOHAMMED, and VINCE ROY,

                        Defendants.                         :

                                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DOXIMITY, INC.                                              :

                        Counterclaim Plaintiff,             :

            v.                                               :

OPENEVIDENCE INC.,                                          :

                        Counterclaim Defendant.             :

                                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

~~**DOXIMITY, INC. AND PATHWAY MEDICAL, INC.'S AMENDED
COUNTERCLAIMS AND DOXIMITY, INC., JEY BALACHANDRAN, JAKE
KONOSKE, AND PATHWAY MEDICAL, INC.'S ANSWER TO AMENDED
COMPLAINT AND AMENDED AFFIRMATIVE DEFENSES**~~

**DOXIMITY, ~~INC. AND PATHWAY MEDICAL~~, INC.'S [PROPOSED] SECOND AMENDED COUNTERCLAIMS**

~~Counterclaim-Plaintiffs~~<u>Counterclaim-Plaintiff</u> Doximity, Inc. ("Doximity") ~~and Pathway Medical, Inc. ("Pathway") allege~~<u>alleges</u> against Counterclaim-Defendant OpenEvidence Inc. ("OpenEvidence") upon knowledge as to ~~themselves~~<u>itself</u> and ~~their~~<u>its</u> own acts and upon information and belief as to all other matters, as follows:

**NATURE OF THE COUNTERCLAIMS**

1.    Doximity—founded in 2010, more than a decade before OpenEvidence entered the market—is the leading digital platform for medical professionals in the United States, with over ~~two~~three million registered members. OpenEvidence is a startup offering clinical decision support. Both companies offer medical AI platforms designed to help diagnose and treat medical conditions. In that respect, they compete.

2.    Judging by his unsolicited correspondence to Doximity's female general counsel—which offered unwelcome "hugs" and discussed the two companies in terms of "emperors who breed," "eunuchs," human "seed," and Doximity's "impoten[ce]," *see* ¶ ~~98~~129, infra—OpenEvidence's Founder and CEO, Daniel Nadler, thinks about this competition often.

3.    At its best, fair competition drives innovation, efficiency, and consumer choice. Unfair competition, however, misleads consumers and diverts time, energy, and money away from productive pursuits. OpenEvidence has chosen unfair competition at its worst. Rather than focus time and money on developing technology to ensure that patients receive the best medical care as quickly as possible, which is Doximity's preferred pursuit, OpenEvidence spends its resources on a smear campaign against its competitors.

4.    As set forth below, OpenEvidence's unfair competition has taken many forms, including spreading falsehoods about Doximity's product and business practices, interfering with Doximity's customer relationships, and even harassing Doximity's employees.

~~4~~5.    As one OpenEvidence employee wrote to a colleague: "***Daniel [Nadler] is dead set on making enemies and tilting at Doximity windmills***."

5. ~~Part and parcel of this campaign are OpenEvidence's three federal lawsuits against competitors Doximity, Pathway, and non-party Veracity Health, alleging that its competitors visited www.openevidence.com and used its free, publicly accessible chatbot for purposes of competitive intelligence. OpenEvidence launched this action with headline-grabbing claims that Doximity stole its "crown jewel" trade secrets by conversing with this chatbot. OpenEvidence then capitalized on the self-generated news coverage of these allegations by spreading it to the Defendants' actual and prospective business partners. Then, before even conducting discovery, OpenEvidence withdrew its sensational claims that its intellectual property was stolen. It had apparently achieved its goals by generating and disseminating negative press coverage. Its newly pared down pleading seeks "nominal damages" for breach of contract, among other relief.~~

6. ~~OpenEvidence's unfair competition is not only unproductive, it is unlawful. OpenEvidence has resorted to outright deceit, harassment, and defamation of Doximity and Pathway, those who work there, and even those who simply use or support their products. It knows these actions are unlawful, which is why, in many cases, OpenEvidence has utilized private investigators, "puppet" social media accounts, concealed payments, financially interested third parties, and anonymous emails to spread falsehoods, harass Doximity's and Pathway's employees, customers, and users, and improperly influence their investors and business partners.~~Discovery in this case has recently confirmed that observation, revealing the extraordinary lengths to which Daniel Nadler would go to attack his direct competitor, Doximity. Beginning in May 2025, Nadler surreptitiously used his personal LinkedIn account to create at least four fake "puppet" LinkedIn accounts under the names "Tech Law News," "Bubble Watch" "Curated Market Research," and "American Courtroom." Nadler chose those objective-sounding

names to deceive readers into believing that they were viewing posts by credible, independent news sources. But they were not: Nadler controlled those accounts, and used them to widely disseminate lies about Doximity. Then he paid LinkedIn (among others) millions of dollars to boost these lies as promoted posts.



*Screenshot of "Curated Market Research" Ad Containing False Statements*

*Excerpt of Subpoenaed Documents Showing Nadler Created Curated Market Research*

7.      The vast scope of OpenEvidence's deceptive campaign came to light only on April 10, 2026, when LinkedIn—in response to a subpoena in this action that OpenEvidence vigorously sought to quash—produced records of OpenEvidence's paid advertising on the

5

LinkedIn platform. Those records disclose a sustained, surgically targeted, and well-funded campaign against Doximity's reputation, business relationships, employees, and stock price. OpenEvidence has run at least 93 LinkedIn advertising campaigns directed at Doximity, comprising more than 20 unique advertisements, which together have generated more than 6.2 million impressions. The campaign began in May 2025 and continues to the present.

8.      OpenEvidence specifically targeted its LinkedIn posts containing false information to maximize the potential damage to Doximity by reaching:

a. virtually every major pharmaceutical company in the United States (the very companies that buy advertising on Doximity's platform and serve as a major source of the company's revenue);

b. the media-buying agencies that place pharmaceutical advertising on Doximity;

c. Doximity's own employees, through campaigns that OpenEvidence named "Doximity Employees" and "Doximity Salespeople";

d. Doximity's engineers, through campaigns named "Engineer Recruiting Miami" and "Engineer Recruiting NYC/BOS to Miami";

e. employees of the Massachusetts Medical Society and the New England Journal of Medicine's publisher; and

f. leading plaintiffs' securities litigation firms and major state pension funds.

9.      To pursue this array of targeted advertising campaigns, OpenEvidence paid more than $3.6 million. Nadler has evidently concluded that the best use for OpenEvidence's money is denigrating Doximity.

10. Additional examples of Nadler's willingness to spare no expense to hurt Doximity abound: Nadler, apparently mistakenly, emailed the blueprint for one of his anti-Doximity schemes to Doximity itself. According to messages between Nadler and an investment bank, Nadler contemplated spending $250 million—more than a third of what OpenEvidence has raised throughout its entire existence—to buy a company named Epocrates. Nadler's thesis was that there was a chance that Epocrates' files contain negative information about Jeff Tangney, Doximity's CEO. Tangney co-founded Epocrates and led it for years before leaving in 2009 and founding Doximity.

11. In the email discussing his Epocrates plan, Nadler acknowledged that the Epocrates business might be an "anchor" to OpenEvidence. Yet he expressed keen interest in the acquisition. This shows Nadler's priorities: he is more than willing to slow down OpenEvidence's core business for the long-shot chance to find documents from *more than 15 years ago* that he could use to hurt Doximity. In brainstorming the Epocrates plan, Nadler expressly modeled himself after Elon Musk, even noting that he hired the same lawyers.

12. One of OpenEvidence's more recent misinformation campaigns leverages a highly realistic-looking AI-generated video a third party created on OpenAI's Sora video platform, which boasts of the tool's ability to create "videos with hyperreal motion and sound." After the third party used Sora to generate a video depicting Tangney and his Doximity colleagues using a whiteboard to plot out how they can lie to investors and customers about Doximity's business, OpenEvidence distributed it despite knowing that *nothing like the scene in the video ever occurred*. OpenEvidence's distribution of a video created with a technology that mimicked reality was plainly intended to mislead viewers into questioning Doximity's good faith and business practices.



*A video still from an AI-Generated Video falsely portraying Doximity's CEO plotting to defraud investors*

13.    OpenEvidence also paid nearly a million dollars to promote two Substack articles written by a third party author that are replete with false and defamatory statements about Doximity. According to a tool for spotting AI drafting, those articles were likely drafted in whole or in part by generative AI. But whether these articles were the product of human or AI hallucination, the message was the same: like the Sora video, these articles erroneously told readers that Doximity was lying to advertisers about the platform's popularity with doctors.

14.    When the author of the Substack articles edited one of these to add corrections and disclaimers, OpenEvidence took a .pdf of the original, uncorrected article and made the entire 17-page .pdf a LinkedIn ad. And, upon information and belief, OpenEvidence personnel circulated a copy of the debunked piece to Doximity's actual and prospective business partners.

15.    OpenEvidence has even used *this litigation* as a conduit to spread misinformation about Doximity. Despite the fact that OpenEvidence withdrew its lurid allegations of trade secrets theft—conceding that OpenEvidence does not allege that Doximity "misappropriated any

trade secrets or proprietary information"—OpenEvidence was secretly paying to promote articles that directly accused Doximity of precisely that conduct.

16. In sum, OpenEvidence has spent millions on LinkedIn (among other platforms) to spread misinformation and lies that are expressly designed to erode the relationship of trust that Doximity had built up over years with its customers and users.

717. OpenEvidence's ~~pattern of deceit begins with the~~deceptive advertising extends beyond hiding behind puppet accounts. Take OpenEvidence's foundational claim that it uses to attract advertisers and raise millions of dollars: that ~~it~~OpenEvidence is used daily by 25-40% of the physicians in the United States. OpenEvidence lacks any reasonable basis for this claim. To this day, ***anyone*** who visits www.openevidence.com—no matter their age or occupation—is presented with a text box, a blinking cursor, and a prompt to "Ask a medical question." While ~~users are~~the system eventually ~~prompted~~prompts users to enter a physician's publicly available "NPI" number (after extended back-and-forth), OpenEvidence does not actually "verify" that the user is a physician any more than asking someone to provide a bar number "verifies" that the person is a lawyer. In sum, OpenEvidence's foundational claim is fundamentally deceitful.

818. Similarly, OpenEvidence has falsely claimed that its platform is accurate and ~~lacks~~free of "hallucinations~~.~~," ~~It~~and has boasted ~~that OpenEvidence scored~~of scoring 100% on the United States Medical Licensing Examination (USMLE). OpenEvidence knows these claims are false, yet it ~~repeats~~continues to make them~~, while knowing~~—even as its users ~~are making~~rely on the platform for "life and death decisions." ~~with the platform.~~

919. OpenEvidence ~~has~~ also ~~spread~~includes false claims about Doximity ~~and Pathway.~~ ~~Among other things, upon information and belief OpenEvidence~~in its own advertising. It has:

9

a. Offered financial incentives to third parties to disseminate false and misleading claims to Doximity's potential users, customers, and partners;

ba. HarassedOpenly harassed Doximity's users by falsely and in some cases anonymously spreading rumors about "ethical investigations" and ethical concerns if they write about Doximity in a positive sense (or about OpenEvidence in a negative sense);

cb. Created and disseminated fabricated and misleading metrics designed to create the false impression that licensed clinicians and doctors prefer OpenEvidence to Doximity and Pathway;

dc. Manipulated data and presented deceptive statistics to support false claims about Doximity's growth, engagement, and stock performance, including as compared to OpenEvidence; and

ed. Claimed that, like Doximity and Pathway, OpenEvidence protects patient confidentiality, despite (1) publishing sensitive information about individual patients on its publicly available website, and (2) selling physician queries to advertisers and pharmaceutical companies.;

10.    OpenEvidence has also created "puppet" news sites and social media accounts that appear to be independent or disinterested from OpenEvidence but are actually controlled by OpenEvidence and exist only to disparage Doximity. Even worse, it has used a false name to conceal the payments it makes to boost these "puppet" and other misleading posts to Doximity's customers, users, and potential partners. These deceptive practices are designed to mislead consumers into believing that the disparagement is unbiased or independent and violate the FTC's Guides Concerning Use of Endorsements and Testimonials in Advertising.

10

     e.  Promoted false comparisons between OpenEvidence and Doximity drawn from purported Coatue Management analyses (which were in fact ghost authored by Nadler himself); and

     f.  Operated puppet LinkedIn "news" accounts to publish and pay to promote advertisements naming Doximity's General Counsel personally, and advertisements targeted to plaintiffs' securities firms and institutional investors, in order to foment litigation and reputational harm against Doximity.

20.    OpenEvidence's sabotage attempts did not stop there. Upon information and belief, OpenEvidence has also used anonymous emails and text messages to spread falsehoods, harass Doximity's employees, customers, and users, and improperly influence its investors and business partners.

21.    Upon information and belief, OpenEvidence has also contacted individuals at potential advertisers and advertiser intermediaries (such as advertising agencies) to improperly influence them to favor OpenEvidence at Doximity's expense. OpenEvidence offers these prospects a consulting contract with nominal obligations but substantial compensation. The message is clear: if you help OpenEvidence seal the deal with your company, you will continue to benefit personally. These arrangements are, to say the least, inconsistent with the codes of conduct that govern the "consultant's" employment. OpenEvidence is not deterred.

22.    In sum, OpenEvidence has chosen a business strategy of deceit: lying about OpenEvidence, lying about Doximity, and using covert and overt misconduct alike to divert business, undermine trust, and gain an unfair competitive advantage.

23. While such tactics may have been permissible in the violent feudal competition that characterized the Late Eastern Han Dynasty—the historical time period that Mr. Nadler gloated about "going deep [] on" in one of his bizarre emails to Doximity—the law has since evolved to forbid them. OpenEvidence's ongoing campaign of misinformation violates federal and state law and must stop.

24. Doximity ~~and Pathway~~ thus ~~are~~is compelled to bring these claims seeking equitable relief and damages for tortious interference with contractual and advantageous business relations; false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(b); the Mass. Gen. L. c. 93A; and Massachusetts common law principles of defamation as codified in Mass. G.L. ch. 231, § 92.

## THE PARTIES

25. Counterclaim-Plaintiff Doximity is a corporation organized and existing under the laws of Delaware with its principal executive offices at 500 3rd Street, Suite 510, San Francisco, California 94107.

14. ~~Counterclaim-Plaintiff Pathway is a corporation organized and existing under the laws of Canada with its principal place of business in Montreal, Canada.~~

26. Counterclaim-Defendant OpenEvidence is a corporation organized and existing under the laws of Delaware with its principal place of business at ~~245 Main Street, Cambridge, Massachusetts 02142.~~215 NW 24th St, Miami, Florida 33127.

## JURISDICTION AND VENUE

27. This Court has jurisdiction over the Lanham Act claims pursuant to Article III of the Constitution, 28 U.S.C. § 1331, and 15 U.S.C. § 1121.

1728.   This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a).

1829.   This Court has personal jurisdiction over OpenEvidence because OpenEvidence has purposefully availed itself of the benefits of this judicial district by filing its Complaint here.

19.   ~~The venue is proper in this district because the Court has personal jurisdiction over OpenEvidence and OpenEvidence filed this action in this venue.~~

30.   Venue is proper in this district under 28 U.S.C. § 1391(b) because the Court has personal jurisdiction over each Counterclaim-Defendant, OpenEvidence filed this action in this venue, and a substantial part of the events giving rise to the Counterclaims occurred in this district.

## FACTUAL ALLEGATIONS

### OpenEvidence's False Claims About User Verification & NPI Counts

2031.   OpenEvidence's business is driven in large part by physician usage. As ~~OpenEvidence CEO Daniel~~ Nadler has stated, OpenEvidence's approach is "DTC [direct-to-consumer], which in [OpenEvidence's] case is direct-to-clinician . . . Doctors are consumers."

2132.   In an attempt to increase the number of physicians that consume its product (advertisements), OpenEvidence claims to "advance[] medicine "at the speed of *trust*."

2233.   Yet OpenEvidence engages in practices that call its trustworthiness into question. Among other things, OpenEvidence makes a variety of false and misleading claims about its platform that are intended to deceive clients about the true size of its physician user base.

2334.  For example, OpenEvidence deceptively touts its credentials by claiming in its advertising and marketing that it limits access to its platform to healthcare professionals that have a National Provider Identifier (NPI).

2435.  As shown below, those claims include that OpenEvidence is "the most widely used medical AI among *verified* U.S. physicians," and "Logged-in, *NPI-verified* U.S. clinicians use OpenEvidence in the moments that matter":

> **This year, more than 100 million Americans will be treated by a clinician using OpenEvidence.**
>
> As a product, OpenEvidence is an AI copilot for doctors that helps them make high-stakes decisions at the point of care. OpenEvidence is the most widely used medical AI among verified U.S. physicians. To date, we have supported over 100 million AI-powered clinical consultations from U.S. doctors and other frontline clinicians.
>
> **OpenEvidence is free and unlimited for health care professionals.**                    Sign Up

> OpenEvidence is the world's leading medical information platform.
>
> **Logged-in, NPI-verified U.S. clinicians** use OpenEvidence in the moments that matter: to make high-stakes treatment decisions at the point of care.

2536.  In reality, OpenEvidence does not restrict access to its platform to physicians and other healthcare providers. Instead, OpenEvidence offers its platform for free to the general public. Any person can use OpenEvidence's platform by visiting OpenEvidence's website, https://www.openevidence.com/.

~~26~~37.   After several searches, users are prompted to enter an NPI number. But OpenEvidence does not actually "verify" that an NPI number entered by a user corresponds with the name associated with that number in the freely accessible National Plan and Provider Enumeration System (NPPES) NPI Registry or otherwise take any steps to determine whether a person seeking access to its platform is or is not a registered physician. NPI names and numbers are public and available for free download at cms.hhs.gov.

~~27~~38.   On information and belief, OpenEvidence does not even verify whether the 10-digit number a user enters as their NPI number is a registered NPI number at all.

~~28~~39.   This allows OpenEvidence to inflate its usage numbers for advertisers, by effectively counting every free user as a licensed United States physician or NPI-holder.

~~29~~40.   OpenEvidence uses its misleading representations about "NPI-verified" users to promote its platform, including by claiming that over 90% of its users are "true-identity physicians."



3041. In a clear contrast to OpenEvidence, to join the Doximity ~~and Pathway platforms~~platform, physicians and other healthcare providers must complete an identity and credential verification process.

3142. Doximity, for example, verifies healthcare providers' identities and credentials in several ways, including validating each member's NPI number, conducting paid identity checks of each member's DOB, address, and license, and using challenge questions from IDology and others. Once verified, members gain access to Doximity's network, newsfeed, and workflow tools. Members of the general public who are not medical professionals do not have full access to Doximity's platform.

3243. Thus, by making false and misleading claims about NPI verification, OpenEvidence seeks to improperly inflate the credibility of its product among existing and prospective customers choosing between OpenEvidence, Doximity, and Pathway. OpenEvidence's claims are intended to lead those choosing between Doximity, Pathway, and OpenEvidence to believe that their offerings are equivalent.

3344. In fact, ~~OpenEvidence's CEO, Daniel~~ Nadler~~,~~ admits that OpenEvidence is not even a healthcare company. In an interview with "No Priors" from September 5, 2025, Nadler stated: "So, I didn't want to build a healthcare company at all. I love Sequoia's quote that OpenEvidence is a consumer internet company masquerading as a healthcare company. I had zero interest in building a healthcare company. OpenEvidence is not a healthcare company."

**OpenEvidence's False and Misleading
Claims About Accuracy and "No Hallucinations"**

3445. OpenEvidence has also made false, misleading, and dangerous claims regarding the purported accuracy of its AI platform.

16

3546.  OpenEvidence's platform does not contain or operate a large-scale neural network trained on massive datasets for natural language understanding and generation, known as a large language model (LLM). Instead, OpenEvidence strings together a system of third-party applications, including LLMs, such as OpenAI.[1]

3647.  LLMs—including the ones OpenEvidence's platform relies on to write its answers—sometimes produce "hallucinations," a well-documented phenomena when AI models produce false, misleading, or fabricated information and present that information as fact.

3748.  Indeed, recent research has confirmed that "AI hallucinations are mathematically inevitable, not just engineering flaws," and "large language models will always produce plausible but false outputs, even with perfect data, due to fundamental statistical and computational limits."[2]

3849.  Nonetheless, as reported by Australia Doctor Group in the publication AusDoc, OpenEvidence co-founder Zachary Ziegler has claimed OpenEvidence's platform "was not at risk of hallucinations."[3]

---

[1] https://www.theinformation.com/articles/chatgpt-doctors-startup-considers-6-billion-valuation-investment (noting OpenEvidence "uses open-source models to search through medical journals and return useful information and citations," and "uses AI from Google, OpenAI and other providers to write its chatbot's responses").

[2] https://www.computerworld.com/article/4059383/openai-admits-ai-hallucinations-are-mathematically-inevitable-not-just-engineering-flaws.html

[3] https://www.ausdoc.com.au/news/jama-and-nejm-back-1-5-billion-ai-that-cannot-hallucinate-to-answer-doctors-medical-questions/

17

~~39~~50.    Similarly, as reported by EnvZone, ~~OpenEvidence CEO Daniel~~ Nadler has stated words to the effect that if OpenEvidence's chatbot "doesn't know the answer, it simply says so—avoiding the risk of hallucinations or false confidence."[4]

~~40~~51.    In a video promoted by one of OpenEvidence's largest investors, Nadler claimed that "these are life and death decisions that our users are making with the platform *so it has to be perfect*."[5]

~~41~~52.    OpenEvidence also disseminated through its primary investor Sequoia the claim that "[t]here are no hallucinations; if the literature is inconclusive, OpenEvidence simply doesn't respond."[6] This claim was designed to lull doctors and patients into a false sense of security about the accuracy of OpenEvidence's answers.

Like a ChatGPT for doctors, OpenEvidence automates this information hunt. The platform searches across 35 milli... publications—and, thanks to a new content... ...d on *The New England Journal of Medicine.* There are no hallucinations; if the literature is inconclusive, OpenEvidence simply doesn't respond. And it communicates just like healthcare professionals do—conversationally, and complete with medical charts and graphs.

~~42~~53.    Those claims are false. OpenEvidence does hallucinate at times.

~~43~~54.    Users have repeatedly publicized concrete examples of OpenEvidence hallucinating and providing wrong answers in practice.[7] For example:

---

[4]     https://envzone.com/how-openevidence-became-doctors-most-trusted-teammate/

[5]     https://www.youtube.com/watch?v=UaDChdL1zzE

[6] https://www.sequoiacap.com/article/partnering-with-openevidence-a-life-saving-healthcare-revolution/.

[7]     *See, e.g.,* https://www.linkedin.com/posts/joannastrober_what-happens-when-the-ai-that-40-of-doctors-activity-73



4455.   In another example, a physician reported that OpenEvidence incorrectly "claims oxacillin needs dose-reduction in dialysis":

52011424497401856-b4FA?utm_source=share&utm_medium=member_desktop&rcm=ACoAABkLyE0
BpmqWlSXq11KtcUQHQWe2g6bvzFs; *see also*
https://www.reddit.com/r/hospitalist/comments/1je4ria/open_evidence/;
https://www.reddit.com/r/medicine/comments/1oy5eto/examples_of_ai_in_medicine_getting_it_wrong/;
*See* https://www.reddit.com/r/medicine/comments/1mslx0z/openevidence_not_quite_as_
accurate_as_id_have/?share_id=dudv8ntLpkc9KSh4NAcGe&utm_content=1&utm_medium=ios_app&ut
m_name=ioscss&utm_source=share&utm_term=1



OpenEvidence claims oxacillin needs dose-reduction in dialysis. It does NOT.

Reminder: don't blindly trust AI for medical decisions. May be one day it'll be consistently accurate, but we're not there yet.

~~45~~56.  Subsequent reporting by an independent source "verified this [result] immediately," noting that it was an example of "one of the most insidious failure modes in artificial intelligence," and concluding "if you aren't watching the data in real-time, it is going to hurt people."[8]

~~46.~~  ~~Others~~57.    Other users have documented additional instances where those answers were not only wrong, but dangerous or even life threatening:



~~47~~58.  Users have also publicly reported that when they independently put it "to a real test," OpenEvidence "flopped on 11 NEJM questions," getting only "about half right."[9]

---

[8]        https://nodesian.medium.com/technically-accurate-medically-fatal-a3bbbc7c27cc

[9]        https://sergeiai.substack.com/p/panda-vs-gibbon-md-100-accuracy-my.

4859.    Yet, as part of its public marketing about the accuracy of its platform, on August 15, 2025, OpenEvidence claimed it had created "the First AI in History to Score a Perfect 100% on the United States Medical Licensing Examination (USMLE)."[10]

4960.    OpenEvidence has promoted paid advertisements repeating that claim.

5061.    That claim is false. As OpenEvidence's separate "answers & explanations" page admits, OpenEvidence's platform did not complete a real proctored USMLE test. Instead, it ran a publicly available sample set that included explanations and citations. And even then, OpenEvidence excluded all image-based questions from the sample set.

5162.    Critically, contrary to the big font and eye-grabbing headline of "perfect 100%,"[11] OpenEvidence acknowledges that it answered a question *incorrectly*, but OpenEvidence disagrees with the answer and therefore credits itself with a "perfect score" according to its own subjective criteria.

5263.    As with its claims that its platform is incapable of hallucinating, OpenEvidence's false and misleading claim that its platform received a "perfect" score on the USMLE was designed to give physicians and potential customers the false impression that the OpenEvidence platform is more accurate than it is—indeed, "perfect," as Nadler has claimed the platform "has to be."[12]

---

[10] https://www.openevidence.com/announcements/openevidence-creates-the-first-ai-in-history-to-score-a-perfect-100percent-on-the-united-states-medical-licensing-examination-usmle.

[11]    *See* https://www.openevidence.com/announcements/openevidence-creates-the-first-ai-in-history-to-score-a-perfect-100percent-on-the-united-states-medical-licensing-examination-usmle.

[12]    https://www.youtube.com/watch?v=UaDChdL1zzE

**OpenEvidence's Campaign of False
and Misleading Statements About Doximity**

5364.    OpenEvidence advertises itself as "the leading medical information platform," and has sought to position itself as a direct competitor to Doximity and Pathway. Rather than pursuing organic innovation, however, OpenEvidence has focused on harming its competitors.

5465.    To accomplish those goals, OpenEvidence has made and continues to make materially false statements regarding Doximity and its AI product, Doximity GPT. OpenEvidence has made these statements in a wide variety of forums with the purpose of influencing Doximity's current and prospective customers, and employees.

**OpenEvidence's Use of AI-Generated Lies About Doximity**

66.    On November 6, 2025, a third party published an article entitled "The $11.7B Dialer: What Doximity Reveals About Healthcare Tech" on Substack.com, a platform that allows independent writers to publish articles to the internet. The author did not conduct reliable research, and his statements about Doximity primarily relied on unverified reddit comments from many years ago.

67.    The November 6 Substack Article was replete with falsehoods and misrepresentations concerning Doximity, including (1) that a court "found it plausible that Doximity misrepresented" the amount of its active users, whereas no court had determined as much, (2) that Doximity publishes false information about physicians to generate physician engagement, (3) that Doximity counts physicians updating their profile information as "engagement" that it then misleadingly reports to pharmaceutical companies, (4) more generally, that Doximity generally misrepresents engagement and use metrics to pharmaceutical companies, (5) that "Doximity isn't a social network for physicians," (6) that Doximity's newsfeed "generat[ed] minimal interaction," (7) that Doximity cannot implement ads into its

22

popular Dialer offering, (8) that Doximity "pretend[s] [users] engage with what makes [Doximity] money," (9) that Doximity "claim[s] users are engaged with content they never see," (10) that Doximity implements "fake measurement methodology," (11) that Doximity's AI products are not growing, (12) that Doximity's users are "experiment[ing]" then "abandoning" the product, (13) that Doximity's AI chat feature "clearly wasn't working," (14) that while "Pharma companies think physicians voluntarily joined and choose to view ads," the "[r]eality [is that doctors] had profiles created without consent and logged in to fix errors," (15) that Doximity "coerces" doctors, (16) that Doximity's "CTO and Director of AI Products were stealing … physicians' identities to conduct corporate espionage," (17) that "physicians spend 12 times more time [on OpenEvidence] than on Doximity," (18) that Doximity has "resort[ed] to buying engagement," (19) that "Doximity couldn't build competitive AI technology through legitimate means," (20) that Doximity's employees "hacked into a competitor's platform, and tried to extract trade secrets using techniques 'typically discussed only on the dark web,'" (21) that Doximity "got caught," (22) and that "Doximity sells Physician info to whoever asks for it," among other statements. Further, the Substack article repeated OpenEvidence's claims of trade secret misappropriation and defamation that OpenEvidence itself had determined it could not support. It also utilized a screenshot purporting to show a Doximity executive attempting to access OpenEvidence. OpenEvidence's counsel has acknowledged that this screenshot is fabricated.

68.    One version of this Substack article included an AI-generated video that purported to depict Jeff Tangney and other Doximity executives concocting a scheme to mislead investors and advertisers about physician usage of Doximity. The video was a hallucination upon a hallucination—a completely fabricated video depicting events that themselves were imagined

23

by the Substack's author. OpenEvidence knew this and distributed it anyway. Upon information and belief, OpenEvidence even distributed the video as a standalone YouTube link without reference to the accompanying Substack. This compounded the misleading nature of the video by untethering it from the speculations and context of the author's theories about Doximity.

69.     The Substack author published a second post on December 12, 2025. This too was expressly aimed at Doximity. The second Substack article states that (1) "Doximity scrapes the NPI database and creates profiles for every physician in America," (2) that "Tangney personally ordered the creation of an internal dashboard to track real engagement because the public metrics had become useless for product decisions," (3) that Doximity's management falsifies ad engagement data, (4) that Doximity's leaders "have been fighting to liquidate their positions at peak valuations while buying back hundreds of millions of dollars of stock on the company's dollar," (5) that Doximity's "[o]rganic growth [has] stall[ed]," (6) that Doximity "[w]histleblowers [have] expose[d]" something that caused the stock to crash, (7) and that auditors brought in to confirm Doximity's advertising metrics only "verify that contracts were signed and ads were served," but "don't verify whether the 'active member' who received the ad was a real person engaging voluntarily - or a scraped NPI record who never logged in."

70.     While OpenEvidence did not author either of the Substack articles, it paid to promote both of them, continued to promote the original article even after one was edited to add corrections and disclaimers, and continued to circulate a copy of the article to Doximity's actual and prospective business partners even after it had been removed from Substack.

71.     The true cost, scale, and targeting of OpenEvidence's promotion of the Substack articles were revealed by LinkedIn's April 10, 2026, production. OpenEvidence paid more than $722,000 to promote the two Substack articles through LinkedIn advertising alone, across at

least twelve ad variants that together generated more than one million impressions. The December 12 article alone cost OpenEvidence more than $430,000 to promote.

72.    OpenEvidence did not promote the Substack articles to a general audience. It purchased placements designed to maximize damage to Doximity, including by serving advertisements promoting the Substack articles to pharmaceutical advertising clients (including AbbVie, Amgen, AstraZeneca, Bayer, Boehringer Ingelheim, Bristol Myers Squibb, Eli Lilly, Genentech, Merck, Novartis, Novo Nordisk, Pfizer, Sanofi, and Takeda), the nation's leading plaintiffs' securities litigation firms (including Bernstein Litowitz Berger & Grossmann, Robbins Geller Rudman & Dowd, Pomerantz LLP, Rosen Law Firm, and Labaton Keller Sucharow), major pension funds and institutional investors (including the New York State Common Retirement Fund, Texas Permanent School Fund, Ensign Peak Advisors, and Baillie Gifford), short sellers and activist research firms (including Citron Research, Muddy Waters, Spruce Point Capital, Iceberg Research, and Wolfpack Research), investigative journalism outlets (including ProPublica, The Intercept, The Bureau of Investigative Journalism, and ICIJ), major medical associations and publications (including the American Medical Association, the American Heart Association, ASCO, JAMA, and the Massachusetts Medical Society), and Doximity's own employees.

73.    Representative screenshots of OpenEvidence paid promotions of the Substack articles, as produced by LinkedIn, are reproduced below:





**Public Advertisements**

5574.   OpenEvidence has published and paid to promote false advertisements disseminated on LinkedIn and elsewhere, including in the New York Times.

75.   The scale and cost of this paid LinkedIn advertising against Doximity is now confirmed by LinkedIn's April 10, 2026, production in this action. As described above, that production shows that OpenEvidence has paid more than $3.6 million to run at least 93 LinkedIn advertising campaigns targeting Doximity, comprising more than 20 unique advertisements and generating over 6.2 million impressions. A number of the specific false and misleading advertisements that OpenEvidence has paid to run and promote are described in turn below.

5676.   Among other tactics, OpenEvidence claims to have a more successful, prolific, and reliable product than Doximity by manipulating data and presenting deceptive statistics.

5777.   First, starting no later than on or around May 15, 2025, OpenEvidence promoted a LinkedIn advertisement proclaiming that "Doximity is a Loser in the AI Race." The advertisement contains a line graph purporting to display the "monthly visits to OpenEvidence" and claims that those monthly visits outnumber visits to Doximity GPT twelvefold.

27



58_78. The text of the advertisement suggests that the "exponential growth" shown in the line graph represents the growing use of OpenEvidence "among doctors"—a credentialed group that consumers trust with respect to healthcare products—and purports to show that Doximity is a "loser" because its growth appears to be far more modest and linear.

59_79. But both the post and its supposedly scientific-looking chart are deliberately misleading. The chart does not represent monthly visits to OpenEvidence "among doctors" at all; it merely depicts visits from the general user population. In fact, there is no evidence or citation anywhere in the post that the data reflects clinicians' usage in any way. As explained above, OpenEvidence does not limit the use of its website to doctors.

60_80. OpenEvidence's purported statistics are deceptive in yet another way. The advertisement misrepresents the "monthly visits to . . . Doximity's AI Products." The visits represented in OpenEvidence's advertisement completely omit all visits to Doximity's app—,

the primary source of monthly physician visits to its AI products. Furthermore, OpenEvidence's advertisement only includes traffic to the "Doximity AI" domain.

6181.    An actual comparison of traffic to doximity.com and openevidence.com from the same source (SimilarWeb) and timeframe, shows that traffic to Doximity is nearly double that of OpenEvidence.

6282.    Moreover, upon information and belief, OpenEvidence made these false and misleading claims about Doximity while knowing full well that they were false. As Doximity had previously explained to the market in an earnings call, in the third quarter of fiscal 2025, its "AI tools grew the fastest . . . up 60% over the prior quarter." The chart OpenEvidence published clearly omits this fact by showing the false flat growth curve for Doximity's AI products.

6383.    OpenEvidence's false comparative claims regarding visits to its platform and to Doximity are designed to mislead physicians, clients and Doximity employees into believing that Doximity's business is stagnant amid a rapidly expanding market for AI products. These false statements are intended to distort market perception and unlawfully secure a competitive advantage for OpenEvidence at Doximity's expense. The campaign of deception is material, as it is calculated to influence physicians and clients in their decisions regarding whether to use or support Doximity's services.

6484.    Second, starting no later than on or around May 20, 2025, OpenEvidence advertised that OpenEvidence is "America's #1 App for Doctors" and displayed a purported ranking in the "Medical" category on the Apple App Store.

6585.    OpenEvidence's advertisement falsely represents that OpenEvidence is "#1 for Doctors," while Doximity is "#5 for Doctors," suggesting that a credentialed and trusted group

(doctors) has expressed a preference for OpenEvidence based on their experience, i.e., that a majority chose OpenEvidence.

86. This claim is false. The Apple App Store lacks a "for Doctors" category; that purported metric is fictional.

87. In much smaller font, OpenEvidence admits that this claim is false, stating: "The 'Medical' category on the Apple App Store encompasses all medical apps, including those intended for consumers and non-clinical users." But despite admitting that it knows "for Doctors" is not a legitimate third-party metric within the Apple App Store, OpenEvidence misleadingly represents that Apple App Store figures show that "Doctors"—as opposed to users generally—use OpenEvidence in greater numbers than competitor offerings.

88. OpenEvidence's claim is also misleading because it omits the context that (1) the Apple App Store rankings do not measure the total number of downloads, and (2) the OpenEvidence app has roughly 4,500 reviews on the App store, while the Doximity app has over 183,000, which is approximately forty times more than OpenEvidence.

89. Third, starting no later than on or around May 19, 2025, OpenEvidence promoted a false and misleading LinkedIn advertisement claiming that Doximity's stock prices have underperformed those of McDonald's Corporation for the last four years:

70 90.  OpenEvidence disseminated this advertisement shortly after the Doximity

earnings call on May 15, 2025, and referenced the number of times the phrase "AI" was used on

that call. Accordingly, viewers would understand that OpenEvidence was referring referred to

Doximity.

71 91.  OpenEvidence's claim that Doximity's stock has underperformed McDonalds

over the last four years is false as Doximity had been publicly listed for less than four years at

that point.

72 92.  Moreover, Doximity's stock trades at a premium of roughly six times its private

May 2021 price, and over 150 percent higher than its June 2021 IPO price—well above

McDonald's roughly 25 percent gain over the same four-year period.

31

7393.   OpenEvidence's misleading statements about Doximity's stock performance create the false impression that the company is struggling, when in reality Doximity is growing its business strongly and its stock is trading at one of the highest revenue multiples in the entire healthcare and technology industry.

7494.   In apparent recognition of the false and defamatory nature of this advertisement, OpenEvidence took this advertisement down from their LinkedIn library shortly after OpenEvidence filed this lawsuit against Doximity.

**OpenEvidence's False Coatue-Branded Comparisons**

95.    Fourth, starting no later than November 19, 2025, OpenEvidence paid to promote a LinkedIn advertisement citing a purported Coatue Management analysis comparing Doximity to BlackBerry and OpenEvidence to the iPhone. OpenEvidence has spent more than $421,000 promoting this advertisement across at least three variants, which together have generated nearly one million impressions. A screenshot of a representative variant is reproduced below:



96.    This advertisement is false and misleading. By likening Doximity to BlackBerry—a once-dominant product that was eclipsed and rendered commercially irrelevant by the iPhone—the advertisement conveys to its audience that Doximity is in terminal decline and that Doximity is being displaced by OpenEvidence in the way that BlackBerry was displaced by the iPhone. That message is false. Doximity's user base, revenues, and AI product usage are growing. The purported Coatue comparison is based on data that misleadingly omits many of Doximity's users.

97.    OpenEvidence targeted the Coatue BlackBerry-versus-iPhone advertisement directly at Doximity's revenue base. According to the LinkedIn production, OpenEvidence served the advertisement to pharmaceutical advertisers (including AbbVie, Abbott, Amgen,

AstraZeneca, Bayer, Biogen, Bristol Myers Squibb, Eli Lilly, Genentech, Gilead, GSK, Johnson & Johnson, Merck, Moderna, Novartis, Novo Nordisk, Pfizer, Regeneron, Roche, Sanofi, Takeda, and Vertex) and to the media-buying agencies that place pharmaceutical advertising on Doximity (including CMI Media Group, Digitas Health, Havas Health Network, IPG Health, Klick, McCann Health, Omnicom Health, Publicis Health, Real Chemistry, and ZS). Investors, short sellers, and financial media outlets were likewise targeted.

98.    Fifth, starting no later than May 14, 2025, OpenEvidence paid to promote a separate LinkedIn advertisement citing a purported Coatue Management analysis describing OpenEvidence's "rapid adoption" among physicians. This advertisement is, by significant margin, the most expensive advertisement classification in the LinkedIn production: OpenEvidence has spent more than $666,000 promoting it across ten variants running for nearly a year. A screenshot of a representative variant is reproduced below:

34



99.    The "Rapid Adoption" advertisement is false and misleading for at least the reasons already alleged above. OpenEvidence's purported user metrics are the product of a platform that does not verify whether its users are physicians, that treats every anonymous visitor to www.openevidence.com as a potential "physician." The advertisement's characterization of OpenEvidence as enjoying "rapid adoption" among physicians, as contrasted with Doximity, is therefore built on the same fundamentally deceptive base as OpenEvidence's claims about its NPI-verified user base and its purported "perfect" USMLE score.

35

100.    OpenEvidence's targeting of the "Rapid Adoption" advertisement is particularly revealing. OpenEvidence placed the advertisement through campaigns it named "Coatue Campaign – Just Agencies," "Pharma Clients Media," "Pharma Marketers," "Just Agencies," and, again, "Doximity Employees." "Doximity Marketing Solutions" was explicitly listed among the targeted audiences. In other words, OpenEvidence paid LinkedIn to serve a false advertisement disparaging Doximity directly to (i) Doximity's pharmaceutical advertising customers, (ii) the media-buying agencies that place those customers' advertising on Doximity, (iii) Doximity's own marketing organization, and (iv) Doximity's employees.

**Fake LinkedIn News Sites**

75101. All of the advertisements identified above were published and promoted through OpenEvidence's own LinkedIn page. But the depth of OpenEvidence's desire to defame Doximity goes further, as OpenEvidence has also established multiple fake LinkedIn accounts and posted about Doximity on those accounts in an attempt to trick consumers into believing that the posts are by credible independent sources.

76.    On information and belief, 102.    OpenEvidence has created at least the following LinkedIn pages: "American Courtroom," "Bubble Watch," "Tech Law News," and "Curated Market Research."

36



77103. OpenEvidence has created and used these accounts to masquerade as legitimate news sources on LinkedIn and shield itstheir true identity from consumers while it continuesthey continue to pay for and promote numerous harmful and deceptive advertisements targeting Doximity., including ads that are links to and excerpts from the Substack posts described above:







104. OpenEvidence operates these puppet accounts with the goal of harming Doximity's reputation, disrupting key client relationships, and unfairly advantaging OpenEvidence in the marketplace. Worse, it pushes targeted advertisements designed to promote negative information about Doximity from these LinkedIn accounts while hiding behind misleading account names to give off the appearance of unbiased reporting.

105. All of these LinkedIn pages have very few, or even zero, followers, have no affiliated employees, do not appear to be legal entities or sole proprietorships, and use logos that are either stock images or images that yield no discernable matches when searched.

106. LinkedIn's production of documents in this litigation confirms that Nadler, OpenEvidence's CEO, created all of them. And LinkedIn's advertisement library confirms that OpenEvidence paid to promote ads appearing on these accounts.

107. For example, the "American Courtroom" advertisements targeting Doximity and its employees—which made up ten of that account's 19 total advertisements as of November 11, 2025—are all funded by "Scalable Magic U.S. Inc."

108. The same advertiser, Scalable Magic U.S. Inc., appears for Bubble Watch's singular advertisement, also about Doximity.

109. On November 17, 2025, another account with no followers titled "Curated Market Research" launched a new advertisement aimed at Doximity, also funded by "Scalable Magic U.S. Inc."

110. Scalable Magic U.S. Inc.—the party identified as paying for all of these targeted advertisements mentioning Doximity—does not currently exist. But it used to, before it changed its name to OpenEvidence:[13]

---

[13] Specifically, Scalable Magic U.S. Inc. changed its name to Monocle Technologies Inc. on August 20, 2021, which then changed its name to XYLA Inc. on November 4, 2021, which then changed its name to

39



85111. OpenEvidence is using a false name to promote posts by puppet accounts that itthey created to post negative information about Doximity as if that information were posted by an independent third party. This harmful and deceptive practice is designed to harm Doximity including by targeting its reputation among physicians, destroy Doximity's client relationships, and disrupt the ordinary course of Doximity's business.

86112. These puppet accounts run afoul of the FTC's Guides Concerning Use of Endorsements and Testimonials in Advertising, codified at 16 C.F.R. § 255.0, which emphasize the need for "clear and conspicuous" disclosures when there is a "material connection between an endorser and an advertiser." A material connection includes any relationship that might affect the weight or credibility of the endorsement, such as compensation or other incentives. The failure to disclose such connections can be considered deceptive if it misleads consumers into

---

2021, which then changed its name to XYLA Inc. on November 4, 2021, which then changed its name to OpenEvidence, Inc. on or around February 24, 2025. (*See* Exhibit A, attached hereto (extracts of Delaware Secretary of State records).)

believing that the endorsement is unbiased or independent. OpenEvidence has shielded ~~its~~their actions using these puppet accounts and has thus engaged in a pattern of false endorsements and testimonials that directly harm Doximity.

**OpenEvidence's Targeting of
Doximity's General Counsel, Plaintiffs' Firms, and Pension Funds**

113.    OpenEvidence's use of puppet LinkedIn accounts to disparage Doximity extends beyond generalized commercial smears. OpenEvidence has used those accounts to run paid advertisements personally identifying Doximity's in-house counsel, and to run paid advertisements aimed at the very plaintiffs' firms and pension funds most likely to bring a securities class action against a public company. These efforts go well beyond competitive marketing.

114.    Specifically, OpenEvidence spent at least $129,709 on a LinkedIn advertising campaign, run under the "Tech Law News" puppet account, that identified John Vaughan—Doximity's General Counsel—by name. The campaign ran across five variants from August through December 2025 and generated more than 434,000 impressions. OpenEvidence purchased broad United States reach for this campaign; the evident purpose was to attach Mr. Vaughan's name to OpenEvidence's manufactured "news" content and to broadcast that pairing as widely as possible. A screenshot of a representative variant of the advertisement is reproduced below:

41

~~Social Media~~

115.   That an opposing party or its founder would spend six figures of corporate funds to attach a competitor's in-house counsel by name to a paid advertising campaign is extraordinary. It reflects a campaign of personal intimidation directed at a lawyer responsible for defending Doximity against OpenEvidence's litigation.

116.   Separately, OpenEvidence ran a paid LinkedIn advertising campaign through another of their puppet accounts—"Curated Market Research"—that explicitly referenced a purported shareholder lawsuit against Doximity. A screenshot of the advertisement is reproduced below:



87.    ~~Beyond LinkedIn, OpenEvidence's campaign to harm Doximity has also included the publication of false and disparaging content about Doximity and its employees on numerous online social media platforms.~~

88.    ~~By way of example, on information and belief OpenEvidence disseminated a video on YouTube that, among other things, falsely asserts that Doximity "scrapes" physician information and that Doximity's users do not affirmatively sign up and undergo rigorous verification.~~

117.    OpenEvidence did not broadcast its advertisement to a general LinkedIn audience. Instead, OpenEvidence narrowly targeted it to (i) the nation's leading plaintiffs' securities litigation firms, including Bernstein Litowitz Berger & Grossmann, Robbins Geller Rudman &

Dowd, Pomerantz LLP, Rosen Law Firm, Labaton Keller Sucharow, Dhillon Law Group, Girard Sharp, and Cohen & Gresser, and so-called SEC Whistleblower Lawyers; and (ii) major pension funds and institutional investors with standing to serve as lead plaintiffs, including the New York State Common Retirement Fund, Texas Permanent School Fund, Ensign Peak Advisors, Baillie Gifford, ClearBridge Investments, Geode Capital Management, RhumbLine Advisers, Riverbridge Partners, William Blair, and Fundsmith.

118.    The only plausible purpose of that deliberately narrow targeting was to recruit plaintiffs and plaintiffs' counsel for securities class action litigation against Doximity. The deliberate placement of paid advertising referencing a "shareholder lawsuit" exclusively into the inboxes of the plaintiffs' firms and institutions most likely to file such suits raises serious questions about the extent to which OpenEvidence has sought to weaponize securities litigation against a competitor.

**Client Pitch Decks**

89119. OpenEvidence has not been content to merely publish false and damaging claims about Doximity on LinkedIn and other public platforms. It has also directly provided false and damaging claims to current and prospective clients, seeking to harm Doximity.

90120. For example, a July 2025 pitch deck includes a chart purporting to compare OpenEvidence to Doximity across a variety of metrics, including Newsfeed Monthly Active Users (MAUs). As shown below, OpenEvidence claims that Doximity has 300,000 Newsfeed MAUs—a claim it attributes to public IR reports:

44

## OpenEvidence vs Doximity vs Medscape

| Category | OpenEvidence | Doximity | Medscape |
|---|---|---|---|
| MAUs | 335,700 (up 70,000 over this time last month) | 300,000 to newsfeed (per Q4 IR report) | 1.1M (the vast majority are email opens) |

91121. The claim that Doximity has 300,000 Newsfeed MAUs is false. Doximity has never provided a Newsfeed MAU metric in public IR materials, and instead has stated that it has over 1,000,000 Newsfeed Quarterly Active Users (QAUs). OpenEvidence's claim has no basis in the attribution it provides.

92122. Additionally, OpenEvidence claimed in a July 2025 client pitch deck that it took Doximity "11 years" to get to 300,000 users:



45

93123. That too is blatantly false and misleading. It appears to rely on Doximity's statement in its S-1 that it "had over 300,000 unique active providers . . . use our telehealth tools in the quarter ended March 31, 2021," but those telehealth tools did not launch until May 2020. It has not taken Doximity "11 years" to obtain 300,000 users in any core offering or product. The S-1 is clear as to what that metric refers to, yet OpenEvidence has chosen to use it in a deliberately misleading manner to make OpenEvidence appear better adopted than Doximity to clients.

### Barclays Event

124.    OpenEvidence recently dispatched an advisor to speak at a Barclays event on January 30, 2026. The advisor—a spouse to the CEO of a prominent Healthcare Media & Marketing Agency—used the opportunity to spread misinformation about Doximity, including (1) that Doximity does not sell "intent" (i.e., contextually targeted advertising tied to a physician's real-time clinical question), (2) that Doximity is not a "point of care" tool, (3) that Doximity is merely "the LinkedIn for doctors"—i.e., a social/networking platform, (4) that physicians do not use Doximity when they are with patients; they use it "off hours," (5) that Doximity ads are "definitely less impact[ful]" than OpenEvidence ads, (6) that Doximity's "engagements" are "basically banner ads"—i.e., Doximity mislabels its advertising product, (7) that this was the subject of litigation brought by "the pension fund of New York," (8) that the litigation had "just been settled so that the information doesn't go public"—implying Doximity settled to conceal unfavorable information, (9) that Doximity's most-used feature is the telephone dialer, not its clinical or social platform, (10) that Doctors use the Doximity Dialer "first and foremost"—implying the platform itself (including any AI or clinical tools) has secondary usage, (11) that Doximity charges significantly more than OpenEvidence for

comparable advertising products and is "very expensive" relative to the market, (12) that Doximity's advertising model relies heavily on "email banners" sent to users, and (13) that OpenEvidence scored a "perfect score, 100%" on the USMLE.

**OpenEvidence's Deceptive and Unlawful Campaign
Is Intended to, and Does, Harm Doximity in the Market,
Poach Its Employees, And Interfere with Its Client Relationships**

94125. OpenEvidence, including its CEO Daniel Nadler, has also incessantly solicited Doximity personnel—particularly those with deep insider access to Doximity's clients and product development strategies. Those efforts are a tacit acknowledgement that OpenEvidence needs Doximity's secrets and expertise to compete, undermining itstheir false and misleading public statements about Doximity.

95126. In an improper attempt at recruitment, OpenEvidence has repeatedly harassed Doximity's employees and sent them unsolicited job offers. OpenEvidence hasThey have sent countless unsolicited text messages, like the following text sent to a member of Doximity's sales team, offering a million-dollar bonus just to join OpenEvidence. This employee and most others did not accept their offers.

Ok - I know it's a bit presumptive but here's an offer that we are willing to give you today.

$1M sign on bonus
$1M OTE
$1M Equity a year - renews every year (at the hottest tech company in healthcare right now)

My plan is to retire in 2-3 years and if you're of the same mindset, there is no better place to be than here. Also, it's magnitudes easier to work her not being a public company.

Ok - that's it. Sorry again for the direct reach out but I hope you can see how much we want you on this team.

96.    Nadler127.    OpenEvidence has also directly sent many unsolicited and harassing emails to Doximity employees, in which he has repeatedrepeat the false claims in the advertisements above. For example, Nadler has used OpenEvidence's false claim that "Doximity is a Loser in the AI Race" in recruitment emails targeting Doximity's employees, and included statements such as: "Now set aside whether you think Doximity's engineers — two years behind, with zero career experience in AI — will catch up to a team of Harvard and MIT PhDs…"

97128. As this correspondence demonstrates, OpenEvidence's false and misleading claims about Doximity are part of a calculated attempt by OpenEvidence to harm its competitor Doximity in a variety of ways, including using fear and hyperbole to gain recruitment leverage.

98129. Mr. Nadler's many emails are often lengthy and strange. For example, Nadler sent this unsolicited letter to Doximity's General Counsel, Jennifer Chaloemtiarana, after Doximity's first female employee accepted one of his offers.

From: **Daniel Nadler** <daniel@openevidence.com>
Date: Sun, Aug 31, 2025 at 10:37 AM
Subject: Pre-Re: Letter from Doximity - 'Koury' with a 'K'
To: Jennifer Chaloemtiarana <jchaloemtiarana@doximity.com>

To make this more efficient, how about we agree that at the start of every month, I just send you the list of the people we are taking (with correct spelling), so you can *batch* prepare the letters in advance, as well as the list of the people we are leaving behind.

My only ask in exchange for this offer of logistical efficiency is that you let us know if we overlooked anyone. If the thought occurs to you "Wait, why haven't they taken such-and-such a person yet?!" the simple answer might be that we merely overlooked them, and thus would appreciate the tip in that case.

I know right now it seems inconceivable that you would ever agree to do that, but since by now it is clear that y'all are utterly impotent to retain your own talent, it might dawn on y'all that the planetary show must indeed go on, **the species must indeed continue with *someone's seed***, and perhaps we all just set differences aside and do one *clean* for the ecosphere. I have been going deep lately on the Late Eastern Han Dynasty in 2nd Century China, and the eunuchs of that era managed to achieve that level of ego-dissolution and species-level future projection (唯我無種者，護持斯族，必先奉養能「繁衍」之帝 → "*Only we, the seedless, will protect the species **by prioritizing emperors who breed**"— Hou Hanshu [Book of the Later Han], ch. 78–79 ["Biographies of the Eunuchs"]*). As Jeffrey "The Dude" Lebowski says, "Right on, man."

Consider it.

Hugs and high-fives,

Daniel Nadler, PhD
Founder, OpenEvidence

OpenEvidence

99130. In addition, Nadler wrote the following taunting message to Doximity's General Counsel after she stepped down from her role at Doximity:

From: **Daniel Nadler** <daniel@openevidence.com>
Date: Tue, Aug 26, 2025 at 11:25AM
Subject: Re: Letter from Doximity - Dziobczynski
To: Jennifer Chaloemtiarana <jchaloemtiarana@doximity.com>

we started an internal race of which would last longer: This head of lettuce, or your role at Doximity.



Don't tell me I lost twenty bucks?! I was betting on you, Jen-Junction!

131.    Additionally, OpenEvidence is using its own lawsuit against Doximity as a recruiting tool. In at least one instance, an OpenEvidence employee told a Doximity employee that this could be a "billion-dollar lawsuit for Doximity." Following this, that employee received an unsolicited offer to work there which she declined.

132.    Upon information and belief, OpenEvidence has also widely shared their lawsuit against Doximity with Doximity's clients in an attempt to disrupt Doximity's most significant client relationships.

102133.     In yet another instance, OpenEvidence baselessly threatened a Doximity

employee with a lawsuit against him ***personally*** for speaking on a topic that neither mentioned

OpenEvidence nor discussed any other competitors. OpenEvidence continued with its baseless

and anti-competitive threats by disseminating this letter to multiple third parties in a fruitless bid

to have Doximity's speech cancelled by the organizers of an important pharmaceutical industry

conference.

> We represent OpenEvidence. It has come to our attention that you plan to give a talk on September 9, 2025, at FiercePharma, titled *How to Lose a Doctor in 10 Days: Product and UX Antipatterns Guaranteed to Get you Ghosted*. We understand that you plan to make defamatory statements about OpenEvidence during what you bill as your "sharp-edged" presentation. Sharp edges cut both ways. One of my ███████████ partners will be seated in front of you during your presentation. We are hereby putting you on notice that, should you make defamatory statements about OpenEvidence, we are instructed to bring claims against you *personally*, for any and all such statements, and to seek the maximum damages (including the maximum damages appropriate for defaming a company publicly valued in the billions of dollars) and all available remedies under the law against you *personally*.
>
> We look forward to your presentation.

### OpenEvidence Targets Pathway

103134.     OpenEvidence has also aimed its tactics of harassment and disparagement

at Pathway, and has even directly interfered with Pathway's business relationships.

104135.     In one instance, Pathway had built a significant relationship with a major

advertising agency client and obtained invitations to speak at their events. However, shortly after

OpenEvidence first filed its claims against Pathway, that client rescinded its invitations and

notified Pathway it would not move forward with its commitments.

105136.     Upon information and belief, Nadler personally communicated with the

client, disparaged Pathway, and shared information about its lawsuit.

106137.    In addition, two days after Doximity announced its acquisition of Pathway, Nadler sent an unsolicited email to the founders of Pathway (whom he has never met), stating: "you go and sell your whole company for less cash than I just paid for one of my apartments."

From: Daniel Nadler <daniel@openevidence.com>
Date: Saturday, August 9 2025 at 1:54 AM CEST
Subject: O Canada
To: jonathan@pathway.md, louis@pathway.md, louis.mullie@gmail.com, vince@pathway.md, Vince.Roy@pathway.md

Boys,

I have spent years trying to change the cliché that Canadians are weak negotiators, and there you go and take a once-in-a-lifetime historic opportunity to create generational wealth for yourselves and your children—when pre-product AI companies are trading at a billion dollars, and when a buyer can add a billion dollars in market cap in one trading day just by announcing a buy with the word 'AI' in it—**and you go and sell your whole company for less cash than I just paid for one of my apartments.**

107138.    At the same time OpenEvidence was targeting Pathway's clients and harassing its employees, OpenEvidenceit was also copying Pathway's features and piggybacking off its innovation.

108139.    For example, in 2024, Pathway introduced CME accreditation and announced that "Pathway [was] now the first and only generative AI solution purpose-built for medicine to earn CME accreditation."[14] The following year, OpenEvidence announced the same feature.[15]

109140.    In fact, OpenEvidence personnel, including OpenEvidence co-founder and CTO Zachary Ziegler, Eric Lehman (Head of NLP), Jagath Jai, and Micah Smith, have accessed Pathway's platform on multiple occasions. On information and belief, they did so in order to gather competitive intelligence.

---

[14]    https://www.pathway.md/blog/introducing-cme-for-pathway-ai

[15]    https://www.openevidence.com/announcements/cme-has-arrived

110141.    Moreover, in at least one instance, a member of the OpenEvidence team used placeholder or non-valid National Provider Identifiers (NPIs) to access Pathway's functionality—underscoring the hypocrisy of its claims against Pathway, Doximity, and Veracity Health.

**OpenEvidence Fails to Protect Patient Confidentiality**

111142.    OpenEvidence also makes a variety of false and misleading claims about patient confidentiality on its own AI platform that are intended to deceive physicians and health systems and create a false equivalency between OpenEvidence, Doximity, and Pathway's AI offerings.

112143.    As an example, on April 25, 2025, OpenEvidence announced that "OpenEvidence is now HIPAA compliant," and claimed that "U.S. covered entities can securely input protected health information (PHI) in accordance with HIPAA's privacy and security standards."[16]

113144.    More broadly, OpenEvidence now asserts that it "secure[s] *all* processed data in compliance with HIPAA":



---

[16]    https://www.openevidence.com/announcements/openevidence-is-now-hipaa-compliant.

114145.    OpenEvidence also claims it has "implemented appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of electronic PHI."[17]

115146.    Contrary to its representations, OpenEvidence fails to protect patient confidentiality or comply with the Health Insurance Portability and Accountability Act ("HIPAA"), which among other things requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization.

116147.    OpenEvidence's platform does not scrub PHI from its searches. In fact, OpenEvidence has *disclosed* patient data to third parties and, at times, the public.

117148.    Indeed, OpenEvidence currently has many *publicly available* patient histories on its website, a significant portion of which includeincludes sensitive information. Below is one example, which reveals the full patient name, medical record number (MRN), date of birth, medical condition, and treatment.



---

[17]        https://www.openevidence.com/security

118149.        The ongoing public exposure of protected health information (PHI) has reached such a flagrant and persistent level that even archival sites like "The Wayback Machine"[18] now catalog abundant examples of these breaches—making confidential patient details permanently accessible online. For instance, one OpenEvidence public page features a clinical assessment of a 25-year-old man with chronic sleep issues, listing his symptoms, the results of his sleep study, and even documenting the number of "total arousals" he experienced—sensitive information that should never be publicly viewable. See link below:



119150.        Upon information and belief, OpenEvidence has no General Counsel or named Privacy & Security Officer to oversee its HIPAA compliance or CEO. In contrast to OpenEvidence, Doximity has invested heavily in patient confidentiality, and both internal and

---

18

https://web.archive.org/web/20250611175837/https://www.openevidence.com/ask/7876b336-ddb0-4ea7-a 423-05717a02883b

external checks, completing regular annual SOC-2 audits and hundreds of privacy reviews with health systems.

120151.       OpenEvidence's false and misleading claims about patient confidentiality are designed to lead individuals choosing between Doximity, Pathway, and OpenEvidence to believe the offerings are equivalent, when in fact they are not.

### OpenEvidence Sells User Prompt and Potential Patient Data to Advertisers

121152.       OpenEvidence's representations regarding its protection of patient confidentiality, handling of patient and physician data, and compliance with HIPAA, are also false and misleading because OpenEvidence sells physician-specific prompt data to advertisers and pharmaceutical companies.

122153.       Indeed, OpenEvidence's pitch materials openly highlight that "pharma can target NPIs by their search data," and that "This is the first time in history when search data is available at the NPI level":



123154.    Until it was recently revised, Open Evidence's Privacy Policy admitted that user data, including individual "questions/prompts," may be "sold to third parties or otherwise monetized as a commercial data feed":



**OpenEvidence**
https://www.openevidence.com › policies › privacy   ⋮

**OpenEvidence Inc. Privacy Policy**

May 6, 2025 — User Data. Your user data, including your questions/prompts, may be sold to third parties or otherwise monetized as a commercial data feed.

124155.    Selling individual user search data is a novel business model that departs from accepted industry practices and exposes physicians to legal compliance and malpractice risk. The sale of research queries potentially containing identifiable patient information creates a substantial likelihood that physician users will unknowingly violate physician-patient confidentiality. This deceptive practice will erode client trust in not just OpenEvidence's offering, but offerings from competitors including Doximity and Pathway as well.

125156.    Even though OpenEvidence's privacy policy discloses that it sells queries to advertisers, its Business Associate Agreement, which governs the company's treatment of PHI, does not allow it to share such information with advertisers, much less to share that information publicly on the OpenEvidence platform.[19]

126157.    By engaging in these practices, OpenEvidence fails to protect patient confidentiality, and violates its obligations under HIPAA.

127158.    On information and belief, OpenEvidence even offers clients and agency partners equity in the company, a practice that deepens OpenEvidence's ethical conflicts of interest, and which OpenEvidence does not publicly disclose.

---

[19]    *See* https://www.openevidence.com/policies/baa.

**<u>OpenEvidence Harasses Physician Critics</u>**

~~128~~159.     But when individual physicians have raised legitimate concerns about OpenEvidence's alarming practices, OpenEvidence has aimed its aggressive tactics at them.

~~129~~160.     In one instance, OpenEvidence aggressively retaliated against a physician ~~that~~who posted a screenshot of OpenEvidence's privacy policy:



~~130~~161.     In response to that tweet, OpenEvidence posted a lengthy and aggressive public comment baselessly accusing the physician of personal wrongdoing and referencing this lawsuit.

~~131~~162.     To make matters worse, an individual purporting to be a "freelancer" reached out to the CEO of that employed physician's health system threatening to publicize "allegations" about him and asking if the physician has ever "discuss[ed] OpenEvidence in a negative light."

From: Chris S <chrissfreelance1993@gmail.com>
Date: September 15, 2025 at 5:02:17 AM PDT
To: � Health System CEO and CIO ▌
Subject: Request for comment — ▌ Dr. X ▌

**External Email - Use Caution**

Hello Dr. ▌CIO▌ I hope you had a good weekend. I am a ==freelancer writing a piece== on alleged ethics and conflict of interest allegations surrounding ▌ Dr. X ▌ I have obtained, from a source, a copy of the below letter to ▌ Dr. X ▌

Have you in any of your interactions with ▌ Dr. X ▌ heard him discuss OpenEvidence in a negative light?

Any response — even off the record — would be appreciated.

Chris

~~132~~163.    As shown below, OpenEvidence purports to advance medicine "at the speed of trust":



~~133~~164.    But in reality, OpenEvidence does not address physicians' legitimate concerns about its practices. It prefers to attack and intimidate them into silence.

59

**CLAIMS FOR RELIEF**

**COUNT I**
**(False Advertising in Violation of the Lanham Act (15 U.S.C. § 1125(A))**
**(On behalf of Doximity and Pathway)**

134165.   The paragraphs above are incorporated and reasserted as if fully set forth herein.

135166.   OpenEvidence's marketing and advertising of its AI platform, and OpenEvidence's marketing and advertising concerning Doximity, constitute false and misleading statements of fact in commercial advertising and promotion under the Lanham Act.

136167.   OpenEvidence has made, and continues to make, false or misleading claims and statements, including false claims about Doximity and comparisons between Doximity, Pathway and OpenEvidence.

137168.   OpenEvidence's false and misleading statements include, *inter alia*:

   a.   The statements identified in paragraphs 67, 68, 69, 73, 95, 98, and 124 of the Second Amended Counterclaims;

   ab.   Claiming that, like Doximity and Pathway, OpenEvidence limits access to its platform to healthcare professionals, including by falsely representing that OpenEvidence verifies that users have a National Provider Identifier (NPI);

   bc.   Making false or exaggerated claims regarding the purported accuracy of its platform's results and purported lack of any "hallucinations," including falsely asserting that OpenEvidence scored 100% on the United States Medical Licensing Examination (USMLE);

60

cd. Promoting fabricated and misleading metrics designed to create the false impression that licensed clinicians and doctors prefer OpenEvidence to Doximity and Pathway;

de. Manipulating data and presenting deceptive statistics to make false claims about Doximity's growth, engagement, and stock performance, including as compared to OpenEvidence;

ef. Creating fake LinkedIn accounts purporting to belong to legitimate news sources instead of OpenEvidence or Nadler, which falsely attribute disparagement of Doximity to independent third party sources; and

fg. Claiming that, like Doximity and Pathway, OpenEvidence protects patient confidentiality, despite (1) publishing sensitive information about individual patients on its publicly available website, and (2) selling physician queries to advertisers and pharmaceutical companies.; and

h. Promoting false comparisons between OpenEvidence and Doximity drawn from purported Coatue Management analyses, including by claiming that Doximity will be displaced by OpenEvidence in the way BlackBerry was displaced by the iPhone and that OpenEvidence enjoys "rapid adoption" by physicians, and paying more than $1 million to disseminate those comparisons via LinkedIn advertisements targeted at Doximity's pharmaceutical customers, their media-buying agencies, Doximity's own employees, and the investors and financial media that cover Doximity.

138169.    OpenEvidence's false and misleading claims have a tendency to confuse, mislead, and deceive a substantial segment of its audience as to the real and relative success of

61

OpenEvidence, and Doximity, and Pathway in the medical AI industry, and the characteristics of their AI platform offerings.

139170.        OpenEvidence's false and misleading statements are material because they are likely to influence the decision-making of consumers in the relevant market—which include physicians, health care professionals, and clients—in ways that harm Doximity and Pathway as described above.

140171.        OpenEvidence placed these false and misleading statements in interstate commerce by disseminating these representations nationwide, including through promoted social media posts.

141172.        As a direct and proximate cause of these false and misleading statements, Doximity has been and will continue to be damaged. Doximity's damages include actual damages in the form of lost profits from reduced demand for Doximity GPT; the disgorgement of any profits that OpenEvidence unfairly realized, retained, or gained as a result of its false and misleading advertising; and the costs associated with this action.

142173.        Based on the foregoing, OpenEvidence has engaged in false and deceptive representations that are likely to cause confusion or deceive consumers as to the characteristics of and relative success and consumer confidence in Doximity and Pathway'sDoximity's AI offerings compared with OpenEvidence's competing product, in violation of 15 U.S.C. § 1125.

143174.        On information and belief, OpenEvidence has engaged in this activity knowingly, willfully, and in bad faith.

144175.        OpenEvidence's willful and deliberate acts make this an exceptional case under 15 U.S.C. § 1117(a), and Doximity and Pathway areis thus entitled to enhanced damages, injunctive relief, and an award of attorneys' fees and costs.

**COUNT II**
**(Violations of Mass. Gen. L. c. 93A §§ 2 and 11)**
**~~(On behalf of Doximity and Pathway)~~**

~~145~~176.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

~~146~~177.    At all relevant times, OpenEvidence was engaged in trade or commerce as those terms are used in Mass. G.L. c. 93A, §§ 2 and 11.

~~147~~178.    While engaged in trade or commerce, OpenEvidence engaged in unfair and deceptive acts through the creation or dissemination of a series of false and misleading advertisements, including, without limitation:

  a.    The statements identified in paragraphs 67, 68, 69, 73, 95, 98, and 124 of the Second Amended Counterclaims;

  ~~a~~b.    Claiming that, like Doximity ~~and Pathway~~, OpenEvidence limits access to its platform to healthcare professionals, including by falsely representing that OpenEvidence verifies that users have a National Provider Identifier (NPI);

  ~~b~~c.    Making false or exaggerated claims regarding the purported accuracy of its platform's results and purported lack of any "hallucinations," including falsely asserting that OpenEvidence scored 100% on the United States Medical Licensing Examination (USMLE);

  ~~c~~d.    Promoting fabricated and misleading metrics designed to create the false impression that licensed clinicians and doctors prefer OpenEvidence to Doximity ~~and Pathway~~;

63

d̶e. Manipulating data and presenting deceptive statistics to make false claims about Doximity's growth, engagement, and stock performance, including as compared to OpenEvidence;

e̶f. Creating fake LinkedIn accounts purporting to belong to legitimate news sources instead of OpenEvidence, which falsely attribute disparagement of Doximity to independent third party sources; and

f̶g. Claiming that, like Doximity a̶n̶d̶ ̶P̶a̶t̶h̶w̶a̶y̶, OpenEvidence protects patient confidentiality, despite (1) publishing sensitive information about individual patients on its publicly available website, and (2) selling physician queries to advertisers and pharmaceutical companies.

1̶4̶8̶179.    OpenEvidence's false and misleading claims tend to confuse, mislead, and deceive a substantial segment of its audience as to the real and relative success of OpenEvidence and Doximity and Pathway in the medical AI industry, and the characteristics of their AI platform offerings.

1̶4̶9̶180.    OpenEvidence's false and misleading statements constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

1̶5̶0̶181.    Likewise, OpenEvidence's use of puppet accounts in violation of the FTC's Guides Concerning Use of Endorsements and Testimonials in Advertising, codified at 16 C.F.R. § 255.0, is itself an unfair method of competition and an unfair or deceptive act or practice in the conduct of trade or commerce.

182.    OpenEvidence's practice of offering, and performing on, undisclosed consulting contracts to individuals at potential advertisers, or intermediaries of advertisers, to improperly

influence them to favor OpenEvidence at Doximity's expense is also an unfair method of competition.

~~151~~183.    The unfair and deceptive events described above occurred primarily and substantially in Massachusetts, in which OpenEvidence does business and, ~~conducts~~for much of the relevant period, conducted its principal operations~~,~~ and ~~maintains~~maintained its headquarters.

~~152~~184.    As a result of the unfair and deceptive conduct of OpenEvidence, Doximity ~~and Pathway~~ sustained damages including, but not limited to, damage to their reputations, damages to their relationships with existing and prospective customers, loss of customers and prospective customers, and loss of business opportunities. ~~Doximity and Pathway's~~Doximity's damages include actual damages in the form of lost profits from reduced demand for ~~Doximity and Pathway's~~Doximity's AI offerings; the disgorgement of any profits that OpenEvidence unfairly realized, retained, or gained as a result of its false and misleading advertising; and the costs associated with this action.

**COUNT III**
**(Defamation, Mass. G.L. Ch. 231, § 92~~.~~)**
**~~(On behalf of Doximity)~~**

~~153~~185.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

~~154.    Upon information and belief,~~186.    OpenEvidence published false and defamatory statements about Doximity to third parties, in violation of Massachusetts common law principles of defamation as codified in Mass. G.L. ch. 231, § 92.

~~155~~187.    The false and defamatory statements included, without limitation:

65

a. The statements identified in paragraphs 67, 68, 69, 73, 95, 98, and 124 of the Second Amended Counterclaims;

b. Using a graph comparing monthly visits to OpenEvidence by both non-clinicians and clinicians with monthly visits to the "Doximity AI" domain by clinicians only to declare Doximity a "Loser in the AI Race," while omitting visits to Doximity's app and the doximity.com domain;

c. Claiming that Doximity is ranked lower than OpenEvidence in a "for Doctors" category within the Apple App Store, even though no such category exists in the Apple App Store;

d. Claiming that Doximity's stock price "underperforms McDonald's over the last four years," when Doximity's stock has outperformed McDonald's (NYSE: MCD) over the three years it has been publicly listed;

e. Misrepresenting Doximity's disclosures and claiming that it took Doximity "11 years" to get to 300,000 users; and

f. Claiming without basis that Doximity has 300,000 Monthly Active Users (MAUs) and falsely attributing that figure to Doximity; and

g. Falsely comparing Doximity to BlackBerry and OpenEvidence to the iPhone, and claiming OpenEvidence is enjoying "rapid adoption" by physicians as contrasted with Doximity, through paid LinkedIn advertisements citing purported Coatue Management analyses that OpenEvidence has spent more than $1 million to disseminate.

156188.    These statements are defamatory because they expose Doximity to hatred, contempt, ridicule, or obloquy, and tend to injure Doximity in its business by falsely diminishing the perceived quality of Doximity's products and success in the marketplace among investors, employees, and current and potential customers.

157189.    The statements are defamatory *per se* because they charge Doximity with incompetence and unfitness in its business as a provider of medical information to healthcare professionals, falling within the category of statements that are actionable without proof of special damages under Massachusetts law.

158190.    The defamatory statements were published to third parties including physicians, employees, and current and prospective customers upon which Doximity depends for revenue.

159191.    The statements are false, as evidenced by the independent investigation and verification set forth above.

160192.    OpenEvidence knew or should have known that the statements were false when made, as they included easily verifiable claims for which OpenEvidence possessed and even admitted to possessing facts rendering the statements false.

**COUNT IV**
**(Tortious Interference with Contractual Relations)**

193.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

194.    At all relevant times, Doximity had valid and enforceable advertising contracts with a number of significant pharmaceutical and related advertising customers. Those contracts contemplated recurring and renewable purchases of advertising on Doximity's platform, and Doximity derived substantial revenue from those contracts.

67

195.    OpenEvidence knew of Doximity's contracts with pharmaceutical advertising customers. Indeed, OpenEvidence identified those customers by name in the targeting parameters of the LinkedIn advertising campaigns described above, and OpenEvidence's own personnel, including Nadler, communicated with those customers and their advertising agencies concerning their relationships with Doximity.

196.    OpenEvidence intentionally interfered with Doximity's contracts by improper means and with an improper motive, including by: (i) paying to serve false and defamatory advertisements concerning Doximity directly to personnel at Doximity's contractual counterparties and at the media-buying agencies that those counterparties' advertising on Doximity; (ii) disseminating to those same persons false comparisons purporting to show that Doximity was in decline and that OpenEvidence was displacing it; (iii) offering undisclosed "consulting" contracts with substantial compensation to individual personnel at Doximity's counterparties and its advertising agencies in exchange for favoring OpenEvidence over Doximity; and (iv) concealing OpenEvidence's own identity as the source of the disparagement by running the advertisements through puppet LinkedIn "news" accounts operated by Nadler and paid for by OpenEvidence under a false name.

197.    As a direct and proximate result of OpenEvidence's interference, significant pharmaceutical and related advertising customers ceased purchasing advertising from Doximity, or materially reduced their purchases, or failed to renew their advertising contracts with Doximity.

198.    As a direct and proximate result of OpenEvidence's interference, Doximity has suffered and will continue to suffer damages, including lost advertising revenues and lost profits, in amounts to be proven at trial.

199.    OpenEvidence acted with actual malice and with the intent to harm Doximity and is liable for punitive damages to the extent permitted by applicable law.

## COUNT V
### (Tortious Interference with Advantageous Business Relations)

200.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

201.    In addition and in the alternative to its contractual relationships, Doximity had advantageous business relationships and probable future economic benefit with its pharmaceutical advertising customers, and with the media-buying agencies that place those customers' advertising on Doximity. Doximity derived substantial revenues from those relationships and had a reasonable expectation of deriving additional revenues from those relationships in the future.

202.    OpenEvidence knew of Doximity's advantageous business relationships with pharmaceutical advertising customers and their agencies. OpenEvidence identified those customers and agencies by name in the targeting parameters of the LinkedIn advertising campaigns described above.

203.    OpenEvidence intentionally interfered with Doximity's advantageous business relationships by improper means and with an improper motive, including through: (i) the paid dissemination of false and defamatory advertisements targeted specifically at Doximity's advertising customers and their agencies; (ii) the use of puppet LinkedIn "news" accounts and a shell-entity payor to disguise OpenEvidence as the source of the disparagement; (iii) the offer of undisclosed "consulting" contracts with substantial compensation to individual personnel at Doximity's customers and their agencies in exchange for favoring OpenEvidence; and (iv) the other unlawful conduct alleged throughout these Counterclaims.

69

204. As a direct and proximate result of OpenEvidence's interference, Doximity has suffered and will continue to suffer damages, including lost advertising revenues, lost profits, and loss of advertising customers and prospective advertising customers, in amounts to be proven at trial.

205. OpenEvidence acted with actual malice and with the intent to harm Doximity and is liable for punitive damages to the extent permitted by applicable law.

**PRAYER FOR RELIEF**
**(AS TO DOXIMITY AND PATHWAY'S AMENDED COUNTERCLAIMS)**

WHEREFORE, Counterclaim-PlaintiffsCounterclaim-Plaintiff Doximity and Pathway respectfully requestrequests that this Court grant the following relief:

1.a) A judgment that Counterclaim-Defendant OpenEvidence has made false and misleading statements in violation of 15 U.S.C. § 1125;

2.b) A judgment that Counterclaim-Defendant OpenEvidence engaged in unfair and deceptive acts and practices through the creation of a series of false and misleading advertisements in violation of Mass. G.L. c. 93A, §§ 2 and 11;

3.c) A judgment that Counterclaim-Defendant OpenEvidence published false and defamatory statements about Doximity to third parties, in violation of Massachusetts common law principles of defamation as codified in Mass. G.L. ch. 231, § 92;

d) A judgment that Counterclaim-Defendant OpenEvidence tortiously interfered with Doximity's contractual relations with its advertising customers;

e) A judgment that Counterclaim-Defendant OpenEvidence tortiously interfered with Doximity's advantageous business relationships with its advertising customers and their advertising agencies;

70

4. ~~Enter a~~f)      A permanent injunction, including an order restraining OpenEvidence, and its officers, directors, employees, agents, affiliates, successors, assigns, and all those in privity or acting in concert with it, from further promotion and distribution of the false and misleading advertisements and statements; requiring OpenEvidence to publish a statement explaining that its advertisements are not accurate and withdrawing them from circulation; requiring OpenEvidence to send notice of the withdrawal of its advertisements to all parties who received or saw ~~its~~their advertisements; requiring OpenEvidence to send corrections to any parties to which it has previously made false and misleading statements; and restraining OpenEvidence from engaging in similar false and misleading advertising claims in the future;

5. g)      ~~Order~~An order that OpenEvidence pay Doximity ~~and Pathway~~ the damages ~~Doximity and Pathway have~~it has sustained by reason of the conduct alleged herein;

6. h)      ~~Order~~An order that OpenEvidence pay the costs and attorneys' fees of this action as provided in 15 U.S.C. § 1117 and other applicable law;

7. i) ~~Order~~An order that OpenEvidence pay multiple damages and attorneys' fees as provided by Mass. Gen. L. c. 93A and other applicable law;

8. j) ~~Order~~An order that OpenEvidence pay pre- and post-judgment interest; and

9. k)      Such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**
**~~(AS TO DOXIMITY AND PATHWAY'S AMENDED COUNTERCLAIMS)~~**

Doximity ~~and Pathway~~ respectfully ~~request~~requests a trial by jury on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

* * *

Dated:  ~~November 24~~May 8, ~~2025~~2026
          Boston, Massachusetts

Respectfully submitted,

/s/ *James R. Carroll*                              ~~a~~
James R. Carroll (BBO #554426)
William K. Wray Jr. (BBO #689037)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
william.wray@skadden.com

William E. Ridgway (*pro hac vice*)
Brian O'Connor (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
320 S. Canal Street
Chicago, Illinois 60606
(312) 407-0700
william.ridgway@skadden.com
brian.oconnor@skadden.com

Bijal V. Vakil (*pro hac vice*)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
(650) 470-4500
bijal.vakil@skadden.com

*Counsel for ~~Defendants~~Defendant
Doximity, Inc.~~, Jey Balachandran,
Jake Konoske, and Pathway Medical, Inc.~~*

| Summary report: Litera Compare for Word 11.14.1.3 Document comparison done on 5/8/2026 2:54:04 PM | |
|---|---|
| **Style name:** No Footer | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4925-9996-8164/1/Doximity First Amended Counterclaims (No Answer).docx | |
| **Description:** Doximity First Amended Counterclaims (No Answer) | |
| **Modified DMS:** nd://4898-6538-5112/20/Doximity Second Amended Counterclaims - 2026-05-06.docx | |
| **Description:** Doximity Second Amended Counterclaims - 2026-05-06 | |
| **Changes:** | |
| Add | 350 |
| Delete | 301 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 5 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 9 |
| **Total Changes:** | 666 |