**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

OPENEVIDENCE INC.,

Plaintiff,

v.

DOXIMITY, INC., JEY BALACHANDRAN, JAKE KONOSKE, PATHWAY MEDICAL, INC., LOUIS MULLIE, JONATHAN HERSHON ST-JEAN, HOVHANNES KARAPETYAN, KHUDHUR MOHAMMED, and VINCE ROY,

Defendants.

Civil Action No.
1:25-cv-11802-RGS

# MEMORANDUM OF LAW IN SUPPORT OF OPENEVIDENCE INC.'S MOTION TO COMPEL DISCOVERY

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....... 1

RELEVANT BACKGROUND ....... 4

A. Doximity's Counterclaims Turn on the Accuracy of Its Own Metrics ....... 4

B. OpenEvidence's Requests ....... 5

C. Doximity's Search Parameters ....... 6

1. Search Terms ....... 6

2. Custodians ....... 7

3. Date Range ....... 7

4. Text and Slack Messages ....... 8

ARGUMENT ....... 8

I. DOXIMITY SHOULD BE ORDERED TO IMMEDIATELY PRODUCE ALL RESPONSIVE DOCUMENTS IT TOLD THE COURT IT HAD ALREADY COLLECTED AND REVIEWED ON SEPTEMBER 1, 2026 ....... 8

II. DOXIMITY'S SEARCH TERMS ARE WOEFULLY INADEQUATE ....... 9

III. THE ADDITIONAL CUSTODIANS HOLD UNIQUE, RELEVANT INFORMATION ....... 11

IV. THE DATE RANGE MUST REACH THE PERIOD THE STATEMENTS DESCRIBE ....... 15

V. DOXIMITY SHOULD BE HELD TO ITS AGREEMENT TO COLLECT AND PRODUCE TEXT MESSAGES ....... 16

VI. DOXIMITY MUST PRODUCE DOCUMENTS RESPONSIVE TO REQUEST NOS. 31, 32, AND 34 ....... 17

VII. OPENEVIDENCE HAS PURSUED THIS DISCOVERY WITHOUT DELAY ....... 18

VIII. THE COURT SHOULD SET AN OCTOBER 12, 2026 PRODUCTION DEADLINE FOR DOXIMITY TO PRODUCE THE DOCUMENTS REQUESTED IN THIS MOTION ....... 19

CONCLUSION ....... 19

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abiomed, Inc. v. Enmodes GmbH*,
No. 23-10087-DJC, 2024 WL 4028295 (D. Mass. Sept. 3, 2024) .......... 13

*Agrovana, LLC v. Congo Brands LLC*,
No. 24-12400-FDS, 2025 WL 2549412 (D. Mass. Sept. 4, 2025) .......... 15

*Noonan v. Staples, Inc.*,
707 F. Supp. 2d 85 (D. Mass. 2010) .......... 1

## INTRODUCTION

Doximity recently added new counterclaims for defamation and false advertising based on statements made by an unrelated third-party—many of them in Substack posts (the "Posts")—expressing deep distrust about the veracity of Doximity's reported user metrics and finances. The statements at issue question, among other things, how many physicians actually use Doximity, whether the user engagement it reports to pharmaceutical advertisers is real or fabricated, how its internal metrics compare with its public ones, and how it delivers the advertising it sells. Dkt. 110 ¶¶ 66-73. Doximity claims OpenEvidence should be held liable for these statements because it shared the (already public) Posts with others. Putting aside the legal infirmities of that theory, Doximity must now prove that the statements in the Posts are false, and truth is a complete defense to defamation under Massachusetts law. *See Noonan v. Staples, Inc.*, 707 F. Supp. 2d 85, 90 (D. Mass. 2010) ("The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation.") (citation omitted). It therefore cannot legitimately be questioned that OpenEvidence is entitled to discovery into the veracity of the statements that Doximity has placed at issue. But Doximity has stonewalled discovery relevant to that defense in several ways.

*First*, even with respect to the limited set of custodians and terms that Doximity agreed to run, Doximity is improperly withholding documents that it represented to the Court it already collected and reviewed *five weeks ago*. On September 1, 2026, Doximity represented to the Court that it had already collected and reviewed emails and Slack communications from 12 custodians. Dkt. 126 at 1. Yet, more than a month later, and despite the expedited schedule, Doximity's production remains woefully deficient. There are no documents at all for certain custodians, no slacks or texts for others. Doximity has thus made serious accusations about purported deficiencies in OpenEvidence's production while refusing to produce discovery it determined should be produced weeks ago.

*Second*, Doximity is improperly limiting its search terms. Every search term Doximity agreed to run that concerns its user metrics, engagement, or impressions, is further limited by the term "OE"—the term Doximity uses internally to refer to OpenEvidence. In other words, if a document hits on terms related to the statements in the Posts that Doximity claims are false—which concern *Doximity's own business, not OpenEvidence*—Doximity's terms will only capture the document if it also mentions OpenEvidence. Dkt. 127-5 at 11-12. That limitation does not pass the straight face test. Doximity's records of its own user engagement and ad metrics have no reason to mention OpenEvidence. On October 6, 2026, Doximity rejected 13 of the 20 supplemental search strings OpenEvidence proposed, and agreed to run variations of seven terms only over its existing custodians and narrow date range. Doore Decl., Ex. 8. The principal justification Doximity has offered for applying this limiter is that OpenEvidence proposed strings with an "OE" limiter in December 2025. Dkt. 141-5 at 4; Doore Decl., Ex. 8 at 2-3. But that makes no sense. OpenEvidence proposed those terms *before* the Court granted Doximity's motion for leave to amend, so the terms were not intended to test whether the Posts are false. *See* Dkt. 141-10 at 2-6. Nor can Doximity credibly argue this discovery comes too late. After the Court allowed Doximity to add these claims, the case was then jointly stayed for two months as the parties attempted to mediate. Dkts. 119, 120. Once the stay was lifted on August 31, 2026, OpenEvidence reached out to meet and confer about obtaining this discovery. Doore Decl., Ex. 6.

*Third*, Doximity has refused to collect from the custodians likely to hold the most relevant documents. OpenEvidence has identified specific Doximity employees—including Doximity's chief commercial officer and its co-founder and former chief strategy officer—who are likely to have unique, relevant information regarding Doximity's reported user engagement, ad metrics and its advertising relationships. Doximity has now refused to add any of them, insisting that its

existing custodians are "sufficient." Doore Decl., Ex. 8 at 5. But the existing custodians Doximity points to are its CEO, its Chief Technology Officer, a Director of Products, a Director of Medical AI, and a Vice President of Clinical AI—*i.e.*, the executives involved in hacking OpenEvidence—not the commercial, sales-operations, and ad-delivery personnel who measured, sold, and reported the engagement the Posts describe. *Id.*

*Fourth*, Doximity has refuses to search a broad enough time period to capture information bearing on the Posts' core allegations. Doximity has collected documents from December 1, 2023 through November 30, 2025, even though the Posts describe events beginning in 2021 and the second Post was not even published until December 2025. Doore Decl., Ex. 3 at 15; Doore Decl., Exs. 4, 5.

*Fifth*, Doximity refuses to collect and produce text messages, even though it told the Court on September 1 that "Defendants have agreed to collect both Slack communications and text messages" and that "[p]roduction of text messages is routine in modern litigation." Dkt. 126 at 6, 7 n.4.

*Sixth*, although Doximity now says it "will not withhold" documents responsive to OpenEvidence's most recent requests for production—Request Nos. 31, 32, and 34—which seek documents bearing on the truth of the Posts, Doore Decl., Ex. 8 at 4, that commitment rings hollow. Doximity will search for those documents only through the custodians, date range, and largely the same search terms negotiated before those requests were served—and before the claims for which the documents are relevant were even in the case. *Id.*.

*Seventh*, if the existing schedule is to hold, Doximity should be ordered to complete its production by October 12, 2026. Doximity's October 6 letter, sent after the parties met and conferred that day, confirms that further conferral will not resolve these disputes. Although

Doximity describes its positions as "initial," it refuses to add a single custodian, to expand the date range, to collect any text messages, or to run thirteen of OpenEvidence's twenty proposed strings as written. Doore Decl., Ex. 8. Fact discovery closes on November 10, 2026, and OpenEvidence needs these documents with sufficient time to review them and complete fact depositions before the cutoff. Dkt. 122.

OpenEvidence asks the Court to order Doximity to: (1) apply the search strings in Appendix A attached to the concurrently-filed proposed order; (2) collect and search the files of the custodians in Section III, *infra*; (3) search custodial documents from January 1, 2021 through the present; (4) collect, search, and produce text messages for all custodians, or at the very least the twelve custodians identified in this motion; (5) produce documents responsive to Request Nos. 31, 32, and 34; and (6) complete its production by October 12, 2026. In the alternative, if Doximity cannot complete its production by October 12, OpenEvidence requests that the Court extend all case deadlines by two months to allow sufficient time for discovery needed for OpenEvidence to defend itself against Doximity's counterclaims.

## RELEVANT BACKGROUND

### A. Doximity's Counterclaims Turn on the Accuracy of Its Own Metrics

Doximity alleges that OpenEvidence paid to promote the public Posts, published by an independent physician on November 6 and December 12, 2025, and that they contain false and defamatory statements. Dkt. 110 ¶¶ 66-73. The statements Doximity identifies concern Doximity's own statements to investors and clients about its user engagement, ad metrics, and other key financial indicators of its business. They include, in Doximity's words, "that Doximity counts physicians updating their profile information as 'engagement' that it then misleadingly reports to pharmaceutical companies," that Doximity "'claim[s] users are engaged with content they never see,'" and that it "implements 'fake measurement methodology,'" *id.* ¶ 67(3), (9), (10);

that "'Tangney personally ordered the creation of an internal dashboard to track real engagement because the public metrics had become useless for product decisions,'" and "that Doximity's management falsifies ad engagement data," *id.* ¶ 69(2), (3); and that auditors "only 'verify that contracts were signed and ads were served,' but 'don't verify whether the 'active member' who received the ad was a real person engaging voluntarily - or a scraped NPI record who never logged in,'" *id.* ¶ 69(7).

Doximity also alleges that OpenEvidence misstated Doximity's Newsfeed active users and the time Doximity took to reach 300,000 users, by reference to Doximity's metrics for "the quarter ended March 31, 2021" and telehealth tools that "did not launch until May 2020." *Id.* ¶¶ 120-123. It further alleges that OpenEvidence's re-sharing of these already public Posts caused pharmaceutical advertisers to stop, reduce, or decline to renew their advertising with Doximity. *Id.* ¶¶ 193-205.

Doximity's allegations are not limited to how it internally tracks engagement and impressions. They also extend to how Doximity reports and explains its engagement data to its advertising customers.

**B. OpenEvidence's Requests**

On December 3, 2025, OpenEvidence served Request No. 19, which seeks all documents concerning each allegedly false statement on which the counterclaims rest, "including (i) any evidence related to the truth or falsity of any such allegedly false or misleading statement." Doore Decl., Ex. 9 at 17. Doximity responded that it "will agree to meet and confer to discuss in good faith reasonable parameters for a search for documents that are responsive to this Request." *Id.* After protracted negotiations, in March 2026, Doximity agreed "not to withhold" documents responsive to Request No. 19 "located after a good faith search." Doore Decl., Ex. 3 at 3-4.

After the Court permitted each party "an additional four written requests" on August 31, 2026, Dkt. 124, OpenEvidence served Request Nos. 31-34. Doore Decl., Ex. 2. These requests seek, respectively, documents concerning the truth or falsity of the statements in the Posts (No. 31); the nature of the advertising Doximity represents it will deliver and how it measures against the ads' performance (No. 32); the contracts and relationships Doximity contends OpenEvidence interfered with (No. 33); and Doximity's internal and external records of user engagement and other metrics relevant to the allegations in the Posts (No. 34). On October 2, Doximity objected to each request and agreed only to "meet and confer to discuss in good faith reasonable parameters for a search for documents that are responsive to this Request." *Id*. The parties met and conferred on October 6, and Doximity then sent a letter stating that it "will not withhold documents relating to (1) what Doximity promises its advertising customers and whether it delivers on those promises, and (2) whether OpenEvidence's statements about Doximity's metrics are true or false." Doore Decl., Ex. 8 at 4. But Doximity will search for documents only within its existing 12 custodians (which do not include the people most relevant to the new counterclaims) and narrow date range (same issue), using its existing search terms that are not appropriately targeted, with only nominal additions. *Id.*

### C. Doximity's Search Parameters

#### 1. Search Terms

Until yesterday, October 6, Doximity did not agree to run any terms, custodians, or parameters beyond what it proposed on May 27—sent one day after the Court permitted Doximity add counterclaims based on the Posts. The May 27 letter largely adopted search terms OpenEvidence proposed in December 2025 *before* the Posts were the subject of any counterclaim, and that proposal conditions each string concerning the Posts—user metrics, engagement, or impressions, and the only string naming the Posts' author—on a reference to OpenEvidence. For

example, "(OE) AND (MAU OR (monthly w/3 user*) OR WAU OR (weekly w/3 user*) OR QAU OR (quarter* w/3 user*) OR activ* OR user* OR (activ* w/3 user*) . . . OR engage* . . .)"[1] and "(OE) AND (Kiani OR (Doctor w/3 Kiani)"[2]. Dkt. 127-5 at 11-12.

On September 29, OpenEvidence proposed the supplemental strings in Appendix A, each tied to specific statements Doximity pleads are false. In its October 6 letter, Doximity agreed to run only three of them as proposed (Strings 12, 15, and 22) and portions of four others (Strings 1, 8, 18, and 19). Doore Decl., Ex. 8 at 8-12. It rejected the remaining 13.

**2. Custodians**

Doximity claims it has collected email and Slack communications from twelve custodians. Most of the twelve custodians are relevant to OpenEvidence's Computer Fraud and Abuse Act claim, but not to Doximity's counterclaims. On September 28 and 29, OpenEvidence asked Doximity to add custodians, including Doximity's Chief Commercial Officer and its co-founder and former Chief Strategy Officer. On October 6, 2026, OpenEvidence provided Doximity additional bases for why OpenEvidence's proposed custodians are likely to possess relevant, unique information regarding the Posts. Doore Decl., Ex. 7. On October 6, Doximity refused to add any new custodians, asserting that its existing custodians are "sufficient." Doore Decl., Ex. 8.

**3. Date Range**

Doximity has collected documents from its six Doximity custodians for December 1, 2023 through November 30, 2025, and from its six Pathway custodians for June 1, 2023 through November 30, 2025. OpenEvidence has asked that Doximity search documents dated from

[1] "MAU," "WAU," and "QAU" refer monthly/weekly/quarterly active users.

[2] Dr. Kiani is the author of the complained-of articles.

January 1, 2021 through the present. Doximity has refused, proposing that any additional terms remain limited to December 1, 2023 through November 30, 2025. Doore Decl., Ex. 8 at 13.

#### 4. Text and Slack Messages

Doximity proposed that OpenEvidence collect text messages and wrote in March that "Defendants remain open to collecting, reviewing, and producing certain text messages." OpenEvidence proposed that neither party collect text messages. Dkt. 127-6 at 2. Rather than compromise, Doximity moved to compel, arguing that "Defendants have agreed to collect both Slack communications and text messages." Dkt. 126 at 6. The Court granted Doximity's motion and compelled OpenEvidence to collect text message from all eight custodians. Dkt. 129. But Doximity has now reneged, stating that it does "not agree to collect text messages from [its] custodians." Doore Decl., Ex. 8 at 7. And it has not produced or committed to a date certain by when it will produce Slack messages for most agreed-upon custodians despite claiming that it already collected and reviewed them back on September 1.

## ARGUMENT

### I. DOXIMITY SHOULD BE ORDERED TO IMMEDIATELY PRODUCE ALL RESPONSIVE DOCUMENTS IT TOLD THE COURT IT HAD ALREADY COLLECTED AND REVIEWED ON SEPTEMBER 1, 2026

Doximity is improperly withholding documents that it represented to the Court it already collected and reviewed *five weeks ago*. On September 1, 2026, Doximity represented to the Court that it had already collected and reviewed documents—including emails and Slacks—from 12 custodians. Dkt. 126 at 1 ("Defendants have collected both emails and Slack communications for twelve custodians over a date range spanning more than two years, . . . and reviewed the resulting document population."). Yet, more than a month later, and despite the expedited schedule, Doximity's production remains woefully deficient. Doximity has produced zero documents for certain custodians, and zero slacks or text messages for others. OpenEvidence requested that

Doximity commit to substantially completing its production by October 8, but Doximity refused. The Court should order Doximity to produce immediately all documents it has represented it has already collected and reviewed.

## II. DOXIMITY'S SEARCH TERMS ARE WOEFULLY INADEQUATE

Whether Doximity's reported user engagement figures were accurate, whether its ads were actually delivered to real, human users, whether an internal dashboard told a different story than its public metrics, and how Doximity measured and reported to advertisers the delivery of the advertising it sold are questions answered by Doximity's own records—and obviously not limited to documents that contain a reference to OpenEvidence. A search term that returns a document only if it also mentions OpenEvidence will not find the documents to which OpenEvidence is entitled to defend against Doximity's counter-claims.

Doximity's principal objection—that OpenEvidence's strings are aimed at a "withdrawn generalized fraud theory" rather than the live claims, (Doore Decl., Ex. 8 at 6)—is incorrect. Doximity chose to plead, as false and defamatory, statements by a third-party in publicly available online Substack posts that Doximity "generally misrepresents engagement and use metrics to pharmaceutical companies," "claim[s] users are engaged with content they never see," implements "fake measurement methodology," and "falsifies ad engagement data." Dkt. 110 ¶¶ 67(4), (9), (10), 69(3). Having put the truth of those statements at issue, Doximity cannot object that discovery into whether they are true also seeks to prove that Doximity engaged in fraud. Nor are the Posts a "small sliver" of the case. Doore Decl., Ex. 8 at 4. Doximity pleads twenty-nine separately enumerated statements from the Posts as false, Dkt. 110 ¶¶ 67(1)-(22), 69(1)-(7), alleges that OpenEvidence spent more than $722,000 promoting them, *id.* ¶ 71, and alleges that OpenEvidence's statements caused advertisers to reduce or cancel spending, *id.* ¶¶ 193-205.

Doximity's October 6 counterproposals do not cure the problem. Doximity continues to insist on the "OE" limiter for its active-user string (String 2) on the ground that the string relates to OpenEvidence's Second Set of requests rather than its Third or Fourth. Doore Decl., Ex. 8 at 8. But the scope of discovery does not turn on which set of requests a term serves. And, critically, Doximity provides irrelevant hit counts that account for only existing custodians, not the new custodians relevant to the Posts, as explained below in Section III. OpenEvidence explains below, and in more detail in Appendix A, the relevance of each proposed string:

***User and membership metrics*** *(Strings 2, 12, 13, 15).* Doximity alleges that the Posts incorrectly claim that Doximity lied about or misrepresented the number of active users on the platform, its claimed 80% or 85% membership figure, physician profiles created without consent, and records of physicians who "never logged in." Dkt. 110 ¶¶ 67(4), (6), (14), 69(1), (5), (7), 120-123. Each of Strings 2, 12, 13, and 15 relate to these statements. For example, String 12 ("reserved share program"), tracks the Posts' account of a June 2021 "reserved share program" used to inflate Doximity's user engagement, and Doximity's allegation that the Posts falsely state that it "resort[ed] to buying engagement," Dkt. 110 ¶ 67(18).

***Engagement, impressions, clicks, and measurement*** *(Strings 4-8, 20).* Doximity alleges as false the Posts' statements that Doximity counts profile updates as engagement, "claim[s] users are engaged with content they never see," uses a "fake measurement methodology," and labels as "engagements" what are "basically banner ads." Dkt. 110 ¶¶ 67(3), (9), (10), 124(6). These strings target how Doximity defines, counts, and verifies user engagement, including whether automated or non-human activity is counted.

***Advertising delivery and advertiser decisions*** *(Strings 14, 16, 21).* Doximity alleges that the Posts' statements that Doximity's management falsifies ad engagement data and that auditors

do not verify that ads reach real, engaged physicians are false, Dkt. 110 ¶ 69(3), (7), and that OpenEvidence's statements caused advertisers to cancel or reduce spending, *id.* ¶¶ 193-205. The Posts recount advertiser descriptions of impression "throttling" and "contract delivery patterns," and an advertiser's "negative ROI." Doore Decl., Exs. 4, 5. These strings target how Doximity delivered ad campaigns and why certain advertisers reduced spending. Doore Decl., Ex. 2 at 4.

***Accuracy of reported data*** *(Strings 9, 10, 17, 18).* Doximity alleges as false the Posts' statements that Doximity's "management falsifies ad engagement data" and that its public metrics diverged from an internal dashboard. Dkt. 110 ¶¶ 67(10), 69(2), (3). These strings target documents discussing whether reported figures were inflated, adjusted, overwritten, or withheld from customers, and go directly to core allegations in Doximity's claims.

***Revenue timing*** *(String 22).* The December 12 Post includes a section titled "Revenue Acceleration: A Theory," Doore Decl., Ex. 5 at 16, and Doximity alleges that the Post's statement that Doximity's "[o]rganic growth [has] stall[ed]" is false, Dkt. 110 ¶ 69(5). This string is targeted at identifying documents relevant to these statements.

***The Posts*** *(String 1).* Doximity's internal discussion of the Posts—its assessment of their accuracy and its customers' reactions—bears on falsity, damages, and causation. Dkt. 110 ¶¶ 66–73. Again, the string targets documents relevant to this statement.

## III. THE ADDITIONAL CUSTODIANS HOLD UNIQUE, RELEVANT INFORMATION

In successfully moving to compel discovery from OpenEvidence, Doximity told this Court that in a false advertising and defamation case "it is essential" to collect from "custodians who directly communicated with customers in the market," and that "[t]he mere potential for overlap is not a basis to refuse to collect ESI for important categories of custodians." Dkt. 126 at 8-9. Doximity may not apply different standards to itself.

Doximity's existing custodians are far from "sufficient"—as Doximity suggests. Doore Decl., Ex. 8 at 5. The existing custodians Doximity identifies as knowledgeable are its CEO, its Chief Technology Officer, a Director of Products, a Director of Medical AI, and a Vice President of Clinical AI. *Id.* Doximity asserts that these individuals have "extensive knowledge" of user engagement, advertiser agreements, and audits of Doximity's advertising practices, *id.*, but none is identified as responsible for selling advertising, delivering campaigns against advertiser guarantees, or reporting engagement to advertisers, and most of the existing custodians were selected for OpenEvidence's Computer Fraud and Abuse Act claim.

*Jeff Tangney* (Doximity's CEO). Mr. Tangney is already a custodian, but Doximity has not agreed to search his documents with appropriate search terms or a date range. The Posts' statements about the internal dashboard and about stock sales by Doximity's leaders (among many other issues) plainly concern Tangney, Dkt. 110 ¶¶ 68, 69(2), (4); Doore Decl., Ex. 5, and Doximity told the Court that he is "mentioned over 40 times" in OpenEvidence's complaint, Dkt. 126 at 14. Doximity also alleges that a version of the first Post included an AI-created video purporting to depict "Jeff Tangney and other Doximity executives" making concessions about the lack of "physician usage of Doximity," which Doximity calls "completely fabricated." Dkt. 110 ¶ 68. The executives' own communications about physician usage are relevant evidence of the truth of those statements.

*Nate Gross* (Doximity's co-founder and former Chief Strategy Officer). Dr. Gross co-founded Doximity and served as its Chief Strategy Officer until June 16, 2025, when he became an outside advisor. Dr. Gross participated in Doximity's public earnings calls, where Doximity reports its user and engagement metrics. He has deep knowledge of, and likely communicated frequently about, the issues implicated by the statements that are core to Doximity's counterclaims.

*Lisa Greenbaum* (Doximity's Chief Commercial Officer). According to Doximity's website, she "leads the company's commercial strategy, commercial product, and sales efforts."[3] On information and belief, the advertising sales to the pharmaceutical customers Doximity says reduced spending after the Posts, Dkt. 110 ¶¶ 193-205, fall within the "sales efforts" she leads, and the communications she sent and received about what Doximity actually delivers to those customers go to the heart of causation and damages.

*Jeff Eaton* (Former Doximity Sales lead). Doximity describes Mr. Eaton as a former Doximity employee who "had significant sales responsibilities related to targeting OpenEvidence and Doximity's mutual customers and making statements comparing the two companies." Dkt. 127-5 at 8; *see* Dkt. 126 at 7. OpenEvidence seeks only his Doximity-era files, which are in Doximity's possession.

*Chris Keaney* (Former Senior Vice President of Business Operations and Sales Operations Leader). Mr. Keaney oversaw the internal programs that determined whether advertiser engagement guarantees were met, placing him at the center of how Doximity measured and reported the user engagement metrics at issue in the Posts.

*Ben Greenberg* (Doximity's Senior Vice President of Commercial Products). Doximity's website describes him as "responsible for driving Doximity's commercial product strategy, including growing and scaling new commercial products."[4] On information and belief, Mr. Greenberg prepared and presented an internal analysis of the division between newsfeed and email engagement that bears directly on the fabricated usage statistics described in the Posts.

---

3 https://www.doximity.com/about/leadership#open-modal-lisa-greenbaum.

4 https://www.doximity.com/about/leadership#open-modal-ben-greenberg

*Shivani Patel* (Doximity's Head of Marketing). On information and belief, Ms. Patel oversees the client-facing marketing materials and sales messaging describing Doximity's user engagement to advertisers—the same engagement metrics at issue in the Posts.

*Woody Woodrich* (General Manager, Commercial Products). On information and belief, Mr. Woodrich monitors Doximity's actual user engagement, advises on advertisement placement, and has access to the historical dashboards and reports reflecting true user engagement.

*Nate Closser* (Program Performance Manager). On information and belief, Mr. Closser worked within Doximity's sales operations to ensure advertising campaigns satisfied contractual engagement guarantees and managed the inventory used to meet those guarantees—information that bears directly on how Doximity represented engagement to its pharmaceutical customers.

*Andrew Nevins* (Senior Director, Pricing and Yield Management). On information and belief, Mr. Nevins served as Mr. Closser's counterpart, holding the same role and the same information concerning Doximity's advertising engagement guarantees.

*Paul Jorgensen* (Former Doximity Chief Revenue Officer). On information and belief, Mr. Jorgensen led Doximity's Hospital Solutions business unit, and briefly its Pharma team, during the period when customers paying for Doximity's services were allegedly served advertising inventory inconsistent with their agreements—information that bears on Doximity's representations to those customers. He subsequently pleaded guilty to securities fraud for using inside information to dump Doximity stock.

*Jared Wilkinson* (Senior Vice President, Hospital Partnerships). On information and belief, Mr. Wilkinson reported to Mr. Jorgensen within the Hospital Solutions business unit and was involved in decisions concerning the monetization and disclosure of advertising inventory served to hospital-system customers.

## IV. THE DATE RANGE MUST REACH THE PERIOD THE STATEMENTS DESCRIBE

OpenEvidence requested that Doximity search for documents for the period of January 1, 2021 through the present. Doximity has refused. Doore Decl., Ex. 8 at 12. It has collected documents only from December 1, 2023 through November 30, 2025 (for its Doximity custodians) and June 1, 2023 through November 30, 2025 (for its Pathway custodians). Doximity's proposed date range would exclude relevant information. The Posts on which Doximity's counterclaims describe misconduct at Doximity beginning in 2021 and continuing thereafter. *See Abiomed, Inc. v. Enmodes GmbH*, No. 23-10087-DJC, 2024 WL 4028295, at *3 (D. Mass. Sept. 3, 2024) (finding that discovery should extend to time period covering alleged conduct). Doximity's counterclaims also depend on data from 2021. Doximity alleges that OpenEvidence falsely claimed it took Doximity "11 years" to reach 300,000 users, because Doximity's S-1 reported more than 300,000 unique active providers using its telehealth tools in 'the quarter ended March 31, 2021." Dkt. 110 ¶ 123. A collection that begins December 1, 2023 cannot test those statements. While Doximity has offered the generic response that the requested period is "not proportional to the needs of this case," that cannot be squared with the statements underlying its claims.

The collection should also run through the present. Doximity's collection ends November 30, 2025, Doore Decl., Ex. 8 at 13, *before* (1) the December 12, 2025 Post on which its claims are based, (2) a January 30, 2026 conference at which Doximity alleges an OpenEvidence advisor made false statements about Doximity's engagement metrics, Dkt. 110 ¶ 124, and (3) the alleged damages that Doximity attributes to the Posts. As a result, even the one Posts-related term Doximity has now agreed to run without the "OE" limiter—"Kiani"—will be run over a period that ends before the second Post was published.

## V. DOXIMITY SHOULD BE HELD TO ITS AGREEMENT TO COLLECT AND PRODUCE TEXT MESSAGES

Doximity agreed in writing to collect text messages, Dkt. 127-5 at 12, and told this Court that "Defendants have agreed to collect both Slack communications and text messages" when successfully moving to compel OpenEvidence "to promptly do the same," Dkt. 126 at 6; *see also* Dkt. 129 (granting Doximity's motion). OpenEvidence proposed in June that neither side collect text messages. Dkt. 127-6 at 1. Doximity rejected that proposal, insisted that text messages be collected from all OpenEvidence custodians, and obtained an order requiring OpenEvidence to produce them. Dkt. 126 at 6; Dkt. 129. Having insisted on that rule for OpenEvidence, Doximity cannot exempt itself from it.

Doximity has claimed that, despite its statements to the Court, it does not need to collect text messages unless OpenEvidence shows that the person's text messages likely contain relevant, non-duplicative information. But Doximity recently demanded, and the Court ordered, text messages from all eight OpenEvidence custodians on a general showing that text messaging is routine in the industry. Dkt. 126 at 6, 7 n.4; Dkt. 129. In other words, Doximity obtained relief without making the person-by-person showing it now demands of OpenEvidence.

Doximity's October 6 letter now asserts that its "investigation has confirmed" that its custodians used Slack as their principal messaging tool and "*generally* did not use text messages for *internal* work communications." Doore Decl., Ex. 8 at 7. This is directly contrary to Doximity's representation to the Court that "[v]irtually all companies in this industry use messaging platforms, not email, as a primary form of communication," and "[p]roduction of ***text messages*** is routine in modern litigation." Dkt. 126 at 6, 7 n.4. Moreover, the use of "generally" concedes that some custodians texted about work. And the limitation to "internal" communications ignores texts with advertisers, customers, and other third-parties. Notably,

Doximity does not say what its investigation consisted of, which custodians it asked, or whether any device was examined.

The Court should hold Doximity to its agreement and its representation. *See Agrovana, LLC v. Congo Brands LLC*, No. 24-12400-FDS, 2025 WL 2549412, at *1 (D. Mass. Sept. 4, 2025) (ordering Defendants "to conduct a fulsome search for responsive documents, including Teams messages and text messages"). Indeed, Doximity's counterclaims rely on text messages its employees received, including one sent to "a member of Doximity's sales team." Dkt. 110 ¶ 126.

The Court should order Doximity to collect, search, and produce responsive text messages from each of its custodians.

## VI. DOXIMITY MUST PRODUCE DOCUMENTS RESPONSIVE TO REQUEST NOS. 31, 32, AND 34

OpenEvidence's most recent requests for production seek the core documents needed to test the truth of the Posts' statements. Request No. 31 seeks documents concerning the truth or falsity of the Post statements Doximity contends are false. Doore Decl., Ex. 2 at 2. Request No. 32 seeks the advertising contracts, definitions, and measurement methodology underlying the engagement figures Doximity reports to advertisers—a core issue implicated by the Posts. *Id.* Request No. 34 seeks the dashboards and reports in which Doximity tracks user engagement—another core issue implicated by the Posts. *Id.* at 4. Doximity now states that it "will not withhold" documents concerning what it promises advertisers and whether it delivers what it promises. Doore Dec., Ex. 8 at 4. But that commitment is worthless without agreeing to search parameters that would find those documents. And while Doximity says it is collecting documents bearing on the truth of the Posts "on a go-get basis," *id.* at 8 n.3, it has not identified any such source or document. With fact discovery closing on November 10, there is no time to delay. OpenEvidence needs these documents to prepare for and take depositions, as well as for expert discovery.

## VII. OPENEVIDENCE HAS PURSUED THIS DISCOVERY WITHOUT DELAY

Doximity argues that OpenEvidence waited too long to seek this discovery. Doore Decl., Ex. 8 at 2-3. Not so. Doximity first sought leave to add counterclaims based on the Posts on May 8, 2026, over OpenEvidence's objection, Dkts. 94, 96, and filed its operative counterclaims on May 26, Dkt. 110, when fact discovery was set to close on August 10, Dkt. 96 at 2. Doximity assured the Court that the new claims "will not materially expand discovery," Dkt. 94 at 1; OpenEvidence warned of "substantial discovery that cannot be completed by August 10," Dkt. 96 at 11. Doximity proposed the "(OE) AND" strings the next day. Dkt. 127-5 at 11-12. But the parties promptly thereafter began discussing settlement, and on June 29, the parties jointly moved to "stay all proceedings and deadlines in this action," representing that "[n]o party will be prejudiced by the requested stay." Dkt. 119 ¶¶ 5-6. The Court stayed further proceedings through August 31. Dkt. 120.

Doximity has noted that it identified the Posts in its February 16, 2026 interrogatory answers. Dkt. 141-5 at 4. Whatever those answers disclosed, the Posts did not become the basis for claims until the Court permitted Doximity to file its amendment on May 26, 2026, after it "waited six months after the first Substack article." Dkt. 96 at 8.

OpenEvidence pressed the issue as soon as the stay ended. On August 31, it asked Doximity for a date certain to produce documents "concerning whether the OpenEvidence statements underlying Doximity's counterclaims are false or misleading." Doore Decl., Ex. 6. The same day, the Court entered the current schedule and permitted each party "an additional four written requests." Dkts. 122, 124. OpenEvidence served Request Nos. 31–33 on September 18, conferred on September 22, sent the strings, custodians, and date range at issue on September 29, and served Request No. 34 on September 30. Doore Decl., Ex. 2. There has been no undue delay.

## VIII. THE COURT SHOULD SET AN OCTOBER 12, 2026 PRODUCTION DEADLINE FOR DOXIMITY TO PRODUCE THE DOCUMENTS REQUESTED IN THIS MOTION

Doximity asked the Court to order that "all parties" substantially complete document production by September 29, 2026, explaining that the date "would provide a six-week period for depositions and remediation of any document discovery gaps or disputes." Dkt. 125 at 1; Dkt. 126 at 19–20. If that reasoning applies to OpenEvidence, it should apply to Doximity's own production as well. Doximity has claimed it collected and reviewed its twelve custodians' files as of September 1, 2026, and that it is producing on a rolling basis, and "expect[s] to substantially complete production under the existing parameters on a similar timeline." Dkt. 141-5 at 9. Fact discovery currently closes on November 10, and expert disclosures follow on November 30 and December 28, 2026. Dkt. 122. If this expedited schedule is to hold, the Court should order Doximity to substantially complete the production compelled here by October 12, 2026.

Alternatively, if Doximity requires additional time to complete its productions, OpenEvidence respectfully requests a two-month extension of all case deadlines to allow sufficient time for it to defend itself against Doximity's sweeping counterclaims.

## CONCLUSION

OpenEvidence respectfully requests that the Court require Doximity to (1) apply the search strings in Appendix A attached to the concurrently-filed proposed order; (2) collect and search the files of the custodians in Section III, *supra*; (3) search custodial documents from January 1, 2021 through the present; (4) collect, search, and produce text messages for all custodians, or at the very least the twelve custodians identified in this motion; (5) produce documents responsive to Request Nos. 31, 32, and 34; and (6) complete its production by October 12, 2026. In the alternative, if Doximity cannot complete its production by October 12, OpenEvidence requests that the Court

extend all case deadlines by two months to allow sufficient time for discovery needed for OpenEvidence to defend itself against Doximity's counterclaims.

Dated: October 7, 2026

Respectfully submitted,

/s/ *Stephen Broome*

Stephen Broome (pro hac vice)
stephenbroome@quinnemanuel.com
Scott E. Schlafer (pro hac vice *forthcoming*)
scottschlafer@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Stacylyn M. Doore (BBO# 678449)
Ryan P. Gorman (BBO# 707239)
Vanessa Rodriguez (BBO# 713607)
Zi Chun Wang (BBO# 709803)
stacylyndoore@quinnemanuel.com
ryangorman@quinnemanuel.com
vanessarodriguez@quinnemanuel.com
michellewang@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100

Nathan Hamstra (pro hac vice)
nathanhamstra@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400

*Attorneys for OpenEvidence, Inc.*

**APPENDIX A — SEARCH STRINGS AND THE STATEMENTS THEY ADDRESS**

| **No.** | **String (modified to reflect Doximity's objections)**[5] | **Relevance to Counterclaims** |
|---|---|---|
| 1 | Kiani OR substack | The Posts and Doximity's response to them, including customer communications. Dkt. 110 ¶¶ 66-73. |
| 2 | QAU OR (quarter* /3 user) OR MAU OR (monthly /3 user) OR WAU OR (weekly /3 user) OR DAU OR (daily /3 user) OR Active /3 user | Active-user and membership figures. Dkt. 110 ¶¶ 67(4), (6), (11)-(12), 69(5), 120-123. |
| 4 | (Ad* or User) /3 (Engagement* or Impression*) | Whether reported engagement and impressions reflect real activity. Dkt. 110 ¶¶ 67(2)-(4), (8)-(9), (18), 69(3), 124(6). |
| 5 | Email* /3 (news OR origin* OR market OR ad*) | Engagement attributed to email. RFP No. 34 defines "Engagement" to include clicks "on links in emails." Dkt. 110 ¶ 67(9). |
| 6 | "force open" OR Unfurl* | Whether automated opens or link previews are counted as engagement, and whether Doximity's "engagements" are clicks or banner impressions. Dkt. 110 ¶¶ 67(9), 124(6). |
| 7 | (Ad* or engage*) /3 (Dashboard or Campaign) | The alleged internal dashboard and campaign-level reporting to advertisers. Dkt. 110 ¶ 69(2); Ex. 11. |
| 8 | (physician /5 level /5 data) | Physician-level data provided to customers. Dkt. 110 ¶ 67(3), (22). |
| 9 | Inflat* OR Fraud OR Fake OR Mislead* OR Deceiv* OR Decept* | Whether reported metrics were inflated or misleading. Dkt. 110 ¶¶ 67(10), (18), 69(3). |
| 10 | Hide OR hiding OR hidden OR Conceal* OR Suppress* OR Coverup OR "cover /2 up" OR False OR falsify | Whether internal metrics were withheld from customers or the public. Dkt. 110 ¶¶ 69(2)-(3), 124(8). |

[5] OpenEvidence has modified the search string proposals in this chart to account for Doximity's objections in its October 6 letter. Most of Doximity's objections are baseless, including because Doximity provides "hit counts" for largely irrelevant custodians rather than the custodians OpenEvidence requests in this Motion.

| No. | String (modified to reflect Doximity's objections)[5] | Relevance to Counterclaims |
|---|---|---|
| 12 | "reserved share program" | The June 2021 program described in the November 6 Post. Ex. 10; Dkt. 110 ¶ 67(18). |
| 13 | (80% OR "80 percent" OR "85%" OR "85 percent") /3 active | The "80%" active-membership figure. Dkt. 110 ¶ 69(1), (7); Exs. 10, 11. |
| 14 | Throttl* | Impression "throttling" described in the December 12 Post. Ex. 11; Dkt. 110 ¶ 69(3), (7). |
| 15 | (Stub /3 profile) OR (prepopulat*) OR ("unclaimed profile") OR "ghost profile" OR ("never logged in") | Profiles created from NPI data and records of physicians who "never logged in." Dkt. 110 ¶¶ 67(2), (14), 69(1), (7). |
| 16 | ("negative ROI" OR ("no /2 lift")) /5 (engagement OR "active user*" OR Kiani OR substack) | Advertiser return on investment and the reasons for reduced spending. Dkt. 110 ¶¶ 193-205. |
| 17 | ("do not share" OR "don't share" OR "do not disclose" OR "not for customers") /10 engagement* | Internal metrics withheld from customers. Dkt. 110 ¶¶ 69(2), 124(8). |
| 18 | "manual adjustment" OR "synthetic event" OR "billable event" | Adjustments to recorded engagement events. Dkt. 110 ¶¶ 67(10), 69(3). |
| 19 | (Greenberg AND WeWork) | On information and belief, Mr. Greenberg made a presentation at a WeWork where he discussed the ad engagement fraud discussed in the Posts. |
| 20 | (bot OR bots OR "invalid traffic" OR nonhuman OR "non-human" OR prefetch* OR "safe links" OR "link detonation") /5 engagement* | Whether non-human or automated activity is counted as engagement. Dkt. 110 ¶¶ 67(9), 69(7). |
| 21 | "triggered messaging" OR underdeliver* | Pacing and delivery against advertiser commitments, and make-goods for under-delivery. Dkt. 110 ¶¶ 194, 197. |

| No. | String (modified to reflect Doximity's objections)[5] | Relevance to Counterclaims |
|---|---|---|
| 22 | repaper* OR "pull forward" OR "pulled forward" OR "revenue acceleration" OR "milestone recognition" OR "side agreement" | The December 12 Post's "Revenue Acceleration: A Theory" section, and Doximity's allegation that the Post's statement about "[o]rganic growth" is false. Ex. 11; Dkt. 110 ¶ 69(5). |

**CERTIFICATE OF SERVICE**

I, Stephen Broome, hereby certify that the foregoing document filed today through the Court's CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Stephen Broome*
Stephen Broome (pro hac vice)